SUPREME COURT OF ARIZONA
En Banc

STATE OF ARIZONA,                    )   Arizona Supreme Court
                                     )   No.  CR-05-0163-AP
                    Appellee,        )
                                     )   Pima County
              v.                     )   Superior Court
                                     )   No.  CR2003-1740
JOHN MONTENEGRO CRUZ,                )
                                     )
                    Appellant.       )   **O P I N I O N**
_____      )

Appeal from the Superior Court in Pima County
The Honorable Theodore B. Borek, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
      By   Kent E. Cattani, Chief Counsel,
           Capital Litigation Section
           Amy Pignatella Cain,                            Tucson
           Assistant Attorney General
Attorneys for State of Arizona

LAW OFFICE OF DAVID ALAN DARBY                             Tucson
      By   David Alan Darby
Attorneys for John Montenegro Cruz
_____

**B E R C H**, Vice Chief Justice

¶1      John Montenegro Cruz was convicted of one count of
first degree murder and sentenced to death.  This automatic
appeal followed.  This Court has jurisdiction pursuant to
Article 6, Section 5(3) of the Arizona Constitution and Arizona
Revised Statutes ("A.R.S.") section 13-4031 (2004).

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

¶2 On May 26, 2003, Tucson Police Officers Patrick Hardesty and Benjamin Waters responded to a hit-and-run accident. The investigation led the officers to a nearby apartment.

¶3 The apartment was occupied by two women and Appellant Cruz, who fit the description of the hit-and-run driver. The officers asked Cruz to step outside and identify himself. Cruz said he was "Frank White." Officer Hardesty contacted police dispatch to verify the identity and was told that no Frank White with the birthdate given by Cruz was licensed in Arizona. Hardesty asked Cruz for identification and Cruz replied that he had left it in the car.

¶4 As Hardesty and Cruz approached the car, Cruz leaned in as if retrieving something, then "took off running." Officer Hardesty chased Cruz on foot, while Waters drove his patrol car around the block in an attempt to cut Cruz off.

¶5 When Waters turned the corner, he saw Cruz throw a gun on the ground. Officer Hardesty was nowhere in sight. Waters radioed Hardesty that Cruz had a gun, then got out of his car and drew his service weapon on Cruz, who stated, "Just do

---

[1] We view the facts in the light most favorable to sustaining the verdict. *State v. Tucker*, 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003).

it . . . . Just go ahead and kill me now. Kill me now. Just get it over with." Waters apprehended Cruz after a brief struggle.

¶6 Officer Hardesty's body was discovered immediately. He had been shot five times: Two bullets were stopped by his protective vest, two bullets entered his abdomen below the vest, and a fifth bullet entered his left eye, killing him almost instantly. Four of the five shots were fired from no more than twelve inches away.

¶7 The handgun thrown down by Cruz, a .38 caliber Taurus revolver, holds five cartridges. All five cartridges had been fired, and forensic examiners determined that the five slugs recovered from Hardesty's body and vest were fired from that Taurus revolver. Five unfired .38 cartridges that matched the cartridges fired from the Taurus were found in Cruz's pocket when he was apprehended.

¶8 Cruz was indicted on one count of first degree murder. The State filed its notice of intent to seek the death penalty alleging a single aggravating factor: "The murdered person was an on duty peace officer who was killed in the course of performing the officer's official duties and the defendant knew, or should have known, that the murdered person was a peace officer." A.R.S. § 13-703(F)(10) (2003).

¶9 A jury convicted Cruz of first degree murder and found

the (F)(10) aggravating factor. It found the mitigation insufficient to call for leniency and determined that Cruz should be put to death.

## II. DISCUSSION

¶10     Cruz raises twenty-two issues on appeal and lists an additional twenty-one issues to avoid preclusion.[2]

### A. Jury Issues

#### 1. Change of venue

¶11     Much publicity surrounded the death of Officer Hardesty. He was the first officer from the Tucson Police Department killed in the line of duty in twenty-one years. In light of the media attention, Cruz filed several motions to change venue. All were denied. Cruz claims that the publicity was so pervasive and prejudicial that the court's refusal to move the trial was an abuse of discretion.

¶12     A party seeking a change of venue must show that the prejudicial pretrial publicity "will probably . . . deprive[] [the party] of a fair trial." Ariz. R. Crim. P. 10.3(b). We review a trial court's ruling on a motion for change of venue based on pretrial publicity for an abuse of discretion. *State v. Nordstrom*, 200 Ariz. 229, 239, ¶ 14, 25 P.3d 717, 727 (2001).

¶13     When evaluating pretrial publicity, we determine

---

[2]     These twenty-one issues are listed in an appendix to this opinion.

- 4 -

"whether, under the totality of the circumstances, the publicity attendant to defendant's trial was so pervasive that it caused the proceedings to be fundamentally unfair." *State v. Blakley*, 204 Ariz. 429, 434, ¶ 13, 65 P.3d 77, 82 (2003) (quoting *State v. Atwood*, 171 Ariz. 576, 630, 832 P.2d 593, 647 (1992)). We consider the effect of pretrial publicity, not merely its quantity. *Nordstrom*, 200 Ariz. at 239, ¶ 14, 25 P.3d at 727.

¶14    The analysis of pretrial publicity involves two inquiries: "(1) did the publicity pervade the court proceedings to the extent that prejudice can be presumed?; if not, then (2) did defendant show actual prejudice among members of the jury?" *State v. Murray*, 184 Ariz. 9, 26, 906 P.2d 542, 559 (1995); *see also State v. Bible*, 175 Ariz. 549, 563, 566, 858 P.2d 1152, 1166, 1169 (1993). The mere fact that jury members have been exposed to the facts of the case through media coverage does not create a presumption of prejudice if the jurors can lay aside that information and render a verdict based on the evidence. *Atwood*, 171 Ariz. at 630-31, 832 P.2d at 647-48, *overruled on other grounds by Nordstrom*, 200 Ariz. at 241, ¶ 25, 25 P.3d at 729. Even knowledge of the case or an opinion concerning the defendant's guilt will not disqualify a juror if the juror can "set aside such knowledge or opinion in evaluating the evidence presented at trial." *State v. Gretzler*, 126 Ariz. 60, 77, 612 P.2d 1023, 1040 (1980).

###### a. *Presumed prejudice*

¶15 For prejudice to be presumed, the publicity must be "so unfair, so prejudicial, and so pervasive that [the court] cannot give any credibility to the jurors' answers during voir dire." *State v. Bolton*, 182 Ariz. 290, 300, 896 P.2d 830, 840 (1995) (quoting *Bible*, 175 Ariz. at 565, 858 P.2d at 1168) (alteration in *Bolton*). In other words, we will presume prejudice only if the "media coverage was so extensive or outrageous that it permeated the proceedings or created a 'carnival-like' atmosphere." *Atwood*, 171 Ariz. at 631, 832 P.2d at 648.

¶16 The media extensively covered the death of Officer Hardesty and Cruz's apprehension. Hundreds of television broadcasts and newspaper articles reported the crime and Cruz's suspected guilt. Local radio stations and grocery stores raised money for Hardesty's family; a billboard was erected on a major Tucson street that proclaimed, "Officer Patrick K. Hardesty, Your service to Tucson will never be forgotten"; flags were flown at half staff; and a local police substation was named for Hardesty.

¶17 Although the publicity was extensive, it was not "outrageous" and did not create a "carnival-like atmosphere." In *Bible*, this Court upheld the conviction and death sentence for a defendant who raped and murdered a nine-year-old girl in

- 6 -

Flagstaff, despite similarly pervasive and even more inflammatory pretrial publicity. 175 Ariz. at 560-62, 858 P.2d at 1163-65. In that case, "nearly all potential jurors had some knowledge of the case." *Id.* at 563, 858 P.2d at 1166. Local newspapers reported several pieces of inadmissible evidence, including that Bible had "flunked a lie detector test," and false reports, such as that Bible was a convicted "child molester" who had committed "child rape." *Id.* at 564, 858 P.2d at 1167. This Court nonetheless found that Bible failed to meet the heavy burden of establishing that the court should apply a presumption of prejudice because the reports were separated from the trial by months. *Id.* at 564-66, 858 P.2d at 1167-69.

¶18    In the case before us, the information disseminated to the public was not nearly as sensational as that circulated before the *Bible* trial, and it was almost entirely accurate. Moreover, most of the coverage occurred more than a year before trial.

¶19    As evidence that the trial court should have presumed prejudice, Cruz points to an opinion poll of 100 potential Pima County jurors. Seventy-nine percent of those polled had heard of Hardesty's murder. Of that group, fifty-one percent thought that Cruz was likely guilty of the crime.

¶20    The poll data, however, fail to create a presumption of prejudice. The poll was conducted a year before the start of

the trial and showed that, even among the seventy-nine percent of those polled who had heard of the case, nearly half had no opinion regarding Cruz's guilt. Cruz did not show that potential jurors could not set aside their initial impression of guilt. Cruz failed to meet the "very heavy" burden of establishing that prejudice should be presumed.

### b. Actual prejudice

¶21 In the absence of presumed prejudice, a defendant may demonstrate "that the pretrial publicity was actually prejudicial and likely deprived him of a fair trial." *State v. Davolt*, 207 Ariz. 191, 206, ¶ 49, 84 P.3d 456, 471 (2004). "The relevant inquiry for actual prejudice is the effect of the publicity on the objectivity of the jurors" actually seated. *Murray*, 184 Ariz. at 26, 906 P.2d at 559 (citing *Bible*, 175 Ariz. at 566, 858 P.2d at 1169).

¶22 Aside from reasserting the findings of the poll, Cruz presents no evidence of actual prejudice and we see none. The record shows that the voir dire of the jury pool was extensive; it lasted seven days and included individual questioning by counsel of each prospective juror to weed out potentially biased jurors. Cruz offers no example of an actually prejudiced juror who served on this panel. The trial court did not abuse its discretion by declining to move the trial.

## 2. Sequestration of the jury

¶23    Cruz moved three times to sequester the jury. He argues that the trial court abused its discretion in denying these motions. Sequestration of a jury falls within the discretion of the trial court, Ariz. R. Crim. P. 19.4; we will not disturb a trial court's ruling on sequestration absent "an abuse of discretion and resulting prejudice to the defendant." *Murray*, 184 Ariz. at 33, 906 P.2d at 566 (citing *State v. Schad*, 129 Ariz. 557, 568, 633 P.2d 366, 377 (1981)).

¶24    "When publicity is not sensational [or] inflammatory, there is no need to sequester the jury[,] particularly when the jury has been cautioned not to read the newspapers, listen to the radio or watch television during the trial and there is no indication that the court's instructions were violated." *Gretzler*, 126 Ariz. at 79, 612 P.2d at 1042 (quoting *Collins v. State*, 589 P.2d 1283, 1291 (Wyo. 1979)). In this case, the publicity, while extensive, was not inflammatory.

¶25    Moreover, when the jury was empanelled, the trial judge carefully instructed the jurors not to "read any news stories or articles or listen to any radio or television reports about this case or about anyone who has anything to do with it" and to immediately report any exposure to outside information. The judge reminded the jury of the admonition at every break during the seven-week trial and instructed the jury to re-read

- 9 -

the admonition. The jury is presumed to have followed the court's many instructions on this issue. *State v. Morris*, 215 Ariz. 324, 337, ¶ 55, 160 P.3d 203, 216 (2007).

**¶26** Cruz has not shown that the jury violated the admonition. Indeed, jurors took the admonition seriously enough that even innocuous matters were reported to the judge, who carefully reviewed each report and questioned jurors when appropriate. Given the court's careful and frequent admonitions to the jury and the lack of sensational media coverage or prejudice to Cruz, the trial court did not abuse its discretion in refusing to sequester the jury.

### 3. Striking jurors for cause

**¶27** Cruz contends that the trial court abused its discretion and caused him prejudice by failing to excuse Jurors 62, 123, 127, 136, 150, 169, 178, and 193 for cause. Cruz used peremptory strikes to remove Jurors 136, 150, 169, and 178. Jurors 62, 123, 127, and 193 eventually sat on the jury.

**¶28** We review a trial court's refusal to strike jurors for cause for an abuse of discretion. *State v. Glassel*, 211 Ariz. 33, 47, ¶ 46, 116 P.3d 1193, 1207 (2005); *State v. Medina*, 193 Ariz. 504, 511, ¶ 18, 975 P.2d 94, 101 (1999). Even if a defendant is forced to use a peremptory challenge to remove a juror who should have been excused for cause, however, an otherwise valid criminal conviction will not be reversed unless

- 10 -

prejudice is shown. *State v. Hickman*, 205 Ariz. 192, 196-97, ¶¶ 20-21, 68 P.3d 418, 422-23 (2003).

**¶29** Cruz moved to strike Jurors 62, 123, 127,[3] 136, 150, 169, and 178 for cause on various grounds, including that they had friends or relatives in law enforcement, tended to favor the prosecution, or held initial opinions as to Cruz's guilt. Upon questioning, however, all of these jurors unequivocally stated that they could fairly evaluate the evidence, follow the court's instructions, and set aside any preconceived notions of guilt. The trial court did not abuse its discretion by refusing to strike these jurors for cause.

> *a. Juror 193*

**¶30** Cruz argues that Juror 193, who became the jury foreperson, was prejudiced against him because her husband was a former police officer and because she stated during voir dire that "[Cruz] probably would not want me" sitting on the jury.

**¶31** Cruz did not move to strike Juror 193 for cause. We therefore review for fundamental error. *See State v. Garza*, 216 Ariz. 56, 64, ¶ 28, 163 P.3d 1006, 1014 (2007). We see no fundamental error. When questioned, she stated that she could be fair and impartial to both sides. Cruz's concerns that

---

[3] Cruz's briefs set forth no reason to strike Juror 127. This argument is therefore waived. *See State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989).

sympathies based on her husband's former job might influence her decisions exemplify why a defendant is given peremptory strikes: to remove a qualified juror whom the defendant does not wish to have on the jury.

¶32 Cruz also asks us to consider a statement Juror 193 gave to the press following the entry of the penalty phase verdict that, if the sentence "deters a criminal and saves a peace officer's life in the future, then the message we sent in our decision is positive. The message is, 'It is not OK to take a peace officer's life.'"

¶33 Subject to only a few exceptions, a juror's out of court statement is not admissible to contradict the verdict. *State v. Dickens*, 187 Ariz. 1, 15, 926 P.2d 468, 482 (1996); 8 WIGMORE ON EVIDENCE § 2352(c) (McNaughton rev. 1961). None of the exceptions applies here. Ariz. R. Crim. P. 24.1(c)(3). The trial court did not fundamentally err by not excusing Juror 193.

      *b.* State v. Hickman

¶34 Cruz argues that we should overrule *State v. Hickman*, 205 Ariz. 192, 68 P.3d 418 (2003), and return to the rule established in *State v. Huerta*, 175 Ariz. 262, 262, 267, 855 P.2d 776, 776, 781 (1993), that an erroneous failure to excuse a juror for cause always constitutes reversible error, regardless of prejudice. In overruling *Huerta*, we observed that the *Huerta* rule "forces trial courts to retry cases previously decided by

- 12 -

fair juries.  It is costly to the victims and to the judicial system, and it generates public cynicism and disrespect for the judicial system."  *Hickman*, 205 Ariz. at 200, ¶ 35, 68 P.3d at 426.

¶35    Cruz argues that because "death is different," this Court should apply the *Huerta* standard in capital cases rather than the *Hickman* standard.  We have, however, cited *Hickman* in several capital cases.  *See, e.g.*, *Garza*, 216 Ariz. at 65, ¶ 32, 163 P.3d at 1015; *Glassel*, 211 Ariz. at 46-47, ¶ 41, 116 P.3d at 1206-07; *State v. Anderson*, 210 Ariz. 327, 338, ¶ 29 & n.7, 111 P.3d 369, 380 & n.7 (2005).  We now expressly hold that *Hickman* applies in both capital and non-capital cases.  As the United States Supreme Court stated in *United States v. Martinez-Salazar*, "[s]o long as the jury that sits is impartial, . . . the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."  528 U.S. 304, 313 (2000) (quoting *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988)).  Cruz presents no reason for requiring a new trial when a case was heard by an impartial jury.

4.    Refusal to grant additional peremptory strikes

¶36    Cruz argues that, in light of the extensive pretrial publicity in this case, the trial court should have awarded him five extra peremptory strikes.  We rejected this argument in *Gretzler*, 126 Ariz. at 78, 612 P.2d at 1041.  There we held that

- 13 -

the court's failure to give additional peremptory strikes does not constitute reversible error unless the defendant shows prejudice. *Id.* As discussed above, Cruz has not shown prejudice.

**B. Pretrial Issues**

1. <u>Constitutionality of Rule 20</u>

¶37 Cruz argues that Rule 20 of the Arizona Rules of Criminal Procedure, which governs judgments of acquittal, is unconstitutional in light of the United States Supreme Court's opinions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona* (*Ring II*), 536 U.S. 584 (2002); and *Blakely v. Washington*, 542 U.S. 296 (2004). He therefore asked the trial court to hold Rule 20 unconstitutional. We review the trial court's denial of the motion de novo. *See State v. Casey*, 205 Ariz. 359, 362, ¶ 8, 71 P.3d 351, 354 (2003).

¶38 Rule 20 permits a court to enter a judgment of acquittal on one or more offenses at the close of evidence by either side if no substantial evidence warrants a conviction. Cruz argues that because a jury, and not a judge, must make factual determinations that would subject a defendant to increased or aggravated punishment, having a judge decide a Rule 20 motion is unconstitutional.

¶39 Cruz's argument is meritless. A judge's ruling either granting or denying a Rule 20 motion does nothing to subject a

defendant to increased or aggravated punishment without a jury determination of relevant facts. Indeed, Rule 20 motions raise issues of law, not fact. Moreover, a court's grant of a Rule 20 motion resolves the case in favor of the defendant. Denial of a Rule 20 motion permits the case to go to the jury, the precise result Cruz claims is required by the Court's opinions in *Apprendi*, *Ring II*, and *Blakely*.

### 2. Failure to make pretrial ruling on sentence

¶40 Cruz argues that the trial court erred by refusing to make a pretrial ruling on whether, if the jury decided against the death penalty, the court would sentence him to life or natural life in prison. By refusing to rule before trial, Cruz argues, the court "deprived the jury of a reason to impose a sentence other than death."

¶41 In support of this argument, Cruz cites *Simmons v. South Carolina*, 512 U.S. 154 (1994) (plurality opinion). In *Simmons*, a defendant charged with capital murder was ineligible for parole because of his previous convictions for violent offenses. *Id.* at 156. Because the state argued that the death penalty was appropriate based on Simmons' propensity for future violence, Simmons asked the judge to inform the jury that a life sentence would mean life without parole. *Id.* at 158. The trial court refused to do so, and Simmons was sentenced to death. *Id.* at 159-60. The United States Supreme Court reversed, stating

- 15 -

that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Id*. at 156; *see also Shafer v. South Carolina*, 532 U.S. 36, 49 (2001) (affirming *Simmons*).

¶42 Cruz's case differs from *Simmons*. No state law would have prohibited Cruz's release on parole after serving twenty-five years, had he been given a life sentence. *See* A.R.S. § 13-703(A) (2004). The jury was properly informed of the three possible sentences Cruz faced if convicted: death, natural life, and life with the possibility of parole after twenty-five years.

¶43 Cruz also failed to explain how the trial court could opine on a defendant's sentence before any evidence is offered or a verdict is rendered. The trial court did not err by refusing to "presentence" Cruz.

¶44 In a related argument, Cruz alleges that the trial court abused its discretion by precluding the testimony of the Chairman of the Arizona Board of Executive Clemency, who would have testified about how life sentences are handled in Arizona and a defendant's chances of being released on parole.

¶45 The trial court did not abuse its discretion. The witness would have been asked to speculate about what the Board might do in twenty-five years, when Cruz might have been

eligible for parole had he been sentenced to life. The trial court could reasonably have concluded that testimony on what the Board might do in a hypothetical future case would have been too speculative to assist the jury.

### 3. Cruz's precustodial statement

¶46 Cruz's next argument centers on the statement he made to Officer Waters immediately before being taken into custody: "Just do it . . . . Just go ahead and kill me now. Kill me now. Just get it over with." Cruz argues that these statements should have been excluded.

¶47 We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *See State v. Prion*, 203 Ariz. 157, 160, ¶ 14, 52 P.3d 189, 192 (2002).

¶48 Cruz alleges that the State had agreed that the statements would not be used and that he "relied upon the state's agreement." The record simply does not support Cruz's assertion that there was such an agreement.

¶49 Cruz moved to suppress any statements he made to Tucson police officers "on May 26th, 2003, *during the interrogation of defendant Cruz*" (emphasis added). Cruz supplemented that motion on January 5, 2004, requesting that the court "suppress any and all statements made by defendant during the investigation of this case." Both the supplement and the initial motion, however, referred only to statements Cruz made

*after* his arrest and were based on possible violations of *Miranda v. Arizona*, 384 U.S. 436 (1966). During a pretrial hearing, defense counsel confirmed that the motion related to a post-custody statement made to Detective Filipelli, who briefly interrogated Cruz at the police station after the shooting. The State responded by indicating that it would not seek to introduce that statement into evidence.

¶50 Nothing in the motions requested suppression of the pre-custody statements, nor was any legal basis cited for doing so. Thus, when Cruz objected to the introduction of his pre-custody statement during trial, he was incorrect in stating that the State had agreed not to use any of Cruz's statements; the State had agreed only regarding post-custody statements.

¶51 Cruz also argues that the court abused its discretion by allowing the pre-custody "just shoot me" statement, but he does not explain why the statement is inadmissible. Cruz was not in custody when the statement was volunteered. To the extent that the statement acknowledges guilt, it qualifies as a party admission under Rule 801(d)(2) of the Arizona Rules of Evidence. The trial court did not err by allowing its admission.

4. "Arturo Sandoval" statement

¶52 Soon after he was detained at the crime scene, Cruz complained of chest pains, and paramedics were called. During

- 18 -

the trip to the hospital, Cruz told a paramedic that "Arturo Sandoval" had shot the police officer. Cruz argues that his exculpatory statement should have been admitted either as an excited utterance or under the "rule of completeness."

> a. *Excited utterance*

¶53 Cruz asserts that the trial court erred in precluding the paramedic from testifying that Cruz said, "Arturo Sandoval is the person who shot the officer." Cruz argues that the statement falls within the excited utterance exception set forth in Rule 803(2) of the Arizona Rules of Evidence.

¶54 Rule 803(2) excepts from the hearsay rule a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In analyzing the excited utterance exception, we apply the following three-part test:

1) There must be a startling event,
2) The words spoken must be spoken soon after the event so as not to give the person speaking the words time to fabricate (or reflect), and
3) The words spoken must relate to the startling event.

*State v. Rivera*, 139 Ariz. 409, 411, 678 P.2d 1373, 1375 (1984) (citing 6 WIGMORE ON EVIDENCE § 1750 (Chadbourn rev. 1978)).

¶55 The shooting of a police officer is a startling event, and the words spoken related to that event: thus, the first and third parts are satisfied. Regarding the second part, the

requirement that the words be spoken "soon" after the event, "no precise time limits after the event can be established within which a statement will qualify as an excited utterance." Joseph M. Livermore, Robert Bartels & Anne Holt Hammeroff, 1 *Arizona Practice: Law of Evidence* § 803.2, at 348 (2000). "Lapse of time is only one factor to be considered." *State v. Barnes*, 124 Ariz. 586, 589, 606 P.2d 802, 805 (1980).

¶56    In this case, the paramedic came to the scene thirty to forty minutes after the shooting and remained with Cruz until an hour after the shooting. The trial court held that the statement did not qualify as an excited utterance because Cruz had ample opportunity for conscious reflection and had so reflected before making his exculpatory statement. The trial court did not base its decision solely on the lapse of time, although it considered that factor. We cannot say that the trial court abused its discretion.

### b.    Rule of completeness

¶57    Cruz also urges that the trial court should have admitted the exculpatory "Arturo Sandoval" statement because it admitted the inculpatory "just shoot me" statement. Cruz bases his argument on the "rule of completeness" derived from Rule 106 of the Arizona Rules of Evidence:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other

- 20 -

part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

¶58       Under the rule of completeness, however, only the portion of a statement "necessary to qualify, explain or place into context the portion already introduced" need be admitted. *State v. Prasertphong*, 210 Ariz. 496, 499, ¶ 15, 114 P.3d 828, 831 (2005) (quoting *United States v. Branch*, 91 F.3d 699, 728 (5th Cir. 1996)).   Rule 106 does not create a rule of blanket admission for all exculpatory statements simply because an inculpatory statement was also made.   Because Cruz's statement does not "qualify, explain or place into context" the "just shoot me" statement, the trial court did not abuse its discretion by excluding it.

   5.   Lisa L.'s statement

¶59       Cruz argues that the trial court improperly precluded a statement by Lisa L. that suggested the culpability of a third party.   Lisa L. was killed in a car accident and so was unavailable to testify.

¶60       Before trial, the State moved to exclude Lisa L.'s statement as hearsay.   Cruz countered that, while clearly hearsay, the statement was admissible under Arizona Rule of Evidence 804(b)(5), the "residual hearsay exception."   The trial court disagreed and excluded the statement.   We review this evidentiary ruling for an abuse of discretion.   *Tucker*, 205

- 21 -

Ariz. at 165, ¶ 41, 68 P.3d at 118.

**¶61** An otherwise inadmissible hearsay statement may be admitted under Rule 804(b)(5) if the statement has "equivalent circumstantial guarantees of trustworthiness" that make it "at least as reliable as evidence admitted under a firmly rooted hearsay exception." *State v. Luzanilla*, 179 Ariz. 391, 394, 880 P.2d 611, 614 (1994) (quoting *Idaho v. Wright*, 497 U.S. 805, 821 (1990)). Lisa L.'s statement fails this test for several reasons.

**¶62** First, the trial court found that Lisa L. had motivation to lie because of her close relationship with Cruz and his family. Cruz and Lisa L. had lived together on several occasions and she had dated Cruz's cousin.

**¶63** Second, Lisa L. had a significant criminal history, including prior convictions for car theft and credit card fraud, a probation violation, and, at the time the statement was made, she was facing a subsequent charge of car theft. She also admitted being a drug addict. This history would have made her easily impeachable.

**¶64** Third, the statement contains several levels of hearsay. Lisa L. stated that "the rumor on the street was that [the] cop [had been] shot by another gun" by a man named "Shorty." She could not, however, attribute this information to a source.

¶65 Finally, her alternate version of the Hardesty shooting, including the existence of a second gun, does not fit the evidence.

¶66 In short, Lisa L.'s statement contains no indicia of reliability. The trial court did not abuse its discretion by excluding it.

**C. Trial Issues**

¶67 Cruz made several mistrial motions during trial and after the guilt phase verdict was rendered. We review these motions for an abuse of discretion. *State v. Moody*, 208 Ariz. 424, 456, ¶ 124, 94 P.3d 1119, 1151 (2004). This standard applies to sections C(1) through C(6) of this opinion, ¶¶ 69-103.

1. <u>Juror conversations and witness "hugging"</u>

¶68 Regarding the first of the mistrial motions, Cruz argues that the trial court abused its discretion by failing to grant a mistrial based on several episodes of alleged "juror misconduct" and an incident in which a witness hugged members of the victim's family. "[J]uror misconduct warrants a new trial [only] if the defense shows actual prejudice or if prejudice may be fairly presumed from the facts." *State v. Miller*, 178 Ariz. 555, 558, 875 P.2d 788, 791 (1994).

a. *Juror conversations*

¶69 At the end of the second day of testimony, Juror 118

complained to the jury commissioner that another juror was speaking about the case, in violation of the admonition. The following morning, the judge questioned each juror in the presence of counsel.

¶70    In chambers, Juror 118 stated that she had five concerns. First, she recounted a conversation that she overheard in the elevator:

> When we were leaving the courtroom [yesterday] we got on the elevator with a bunch of jurors . . . . They just started talking about — I don't know if this is bad or not, but I just thought it was a really inappropriate conversation in an elevator with a bunch of jurors . . . . We don't know if . . . people from the public are allowed in the courtroom. And [Juror 7] said, oh, yeah, anyone can go in the courtroom, it's open to the public.

> And then [Juror 123] said, oh because my son — she said either he's in criminal justice or he's a student in criminal justice, I don't recall. I'd like him to come down here. It would be good for him to observe, something like that, not word for word. And then [Juror 7] said oh, well, then you're going to have to ask the Judge about that because I don't know if that would be okay. And I just walked out of there[.] I can't believe these people.

¶71    Second, Juror 118 reported that, when returning from lunch, she thought that Juror 7 and some others might have been discussing the trial because they "got kind of quiet" when she walked into the room. Juror 118 thought they might have been discussing the testimony earlier that day from the two young women who had been involved in the hit-and-run accident with Cruz that began the series of events that led to Officer

- 24 -

Hardesty's death.

¶72    Third, Juror 118 complained that Juror 7 had identified Officer Hardesty's wife to other jurors. Fourth, Juror 118 said that Juror 7 had told other members of the jury that 92 witnesses would testify at the trial. Finally, Juror 118 complained that Juror 7 had told other jury members how the alternate jurors would be selected.

¶73    The trial judge asked the other jurors about these allegations. Juror 7 recalled the elevator conversation as follows:

> [W]e were going down the elevator, one of the gals asked if the — if the trials are open. I said, yeah, I believe all trials are open. Then she said something about her son wanted to come see this one. I said, well, you better talk to the Judge about that, and that's the only thing I can recall that was being said.

Juror 7 did not recall any of the other conversations reported by Juror 118.

¶74    When Juror 123 was asked about the elevator conversation, she described the conversation in more detail:

> I asked somebody if my son could come watch because he's taking a class at Pima, has to come to court and they thought that was the problem, but we didn't discuss the case, I just said, does anybody know is he allowed to come into the courtroom.

Juror 123 made it clear that no discussion had taken place regarding the case. Erring on the side of caution, the trial judge asked the juror not to have her son attend, to which the

- 25 -

juror agreed.

¶75    As these statements indicate, there was nothing inappropriate about the conversation in the elevator; nothing was said about the case.

¶76    As for the conversation regarding the two witnesses, Juror 127 clarified that someone expressed sympathy that the young women seemed nervous.  She confirmed that nothing was said about the substance of their testimony.

¶77    Other jurors similarly recounted the comments about the witnesses.  They confirmed that no discussion took place regarding the testimony itself and that only brief mention was made that the witnesses seemed scared to be testifying.  Because the jurors did not discuss the substance of the testimony and the witness's testimony related only to tangential matters, we conclude that these comments did not affect the jury or the fairness of the trial.

¶78    As to the alleged statements by Juror 7 identifying Mrs. Hardesty, stating (incorrectly) that there would be 92 witnesses in the trial, and describing (incorrectly) how alternates would be selected, no other juror recalled having heard the statements.  Thus, these statements, if made, had no effect on the other jurors.

¶79    The other jurors uniformly stated that they were unaware of any inappropriate conversations, and all jurors

affirmed that they were assiduously following the admonition.

¶80     After all jurors had been questioned, counsel for both Cruz and the State expressed concern about Juror 118's overreaction to innocuous conversations and Juror 7's seemingly authoritative yet often incorrect statements. Defense counsel stated that nothing in the jurors' statements would cause him to move for a mistrial. Cruz and the State jointly moved to excuse Jurors 7 and 118, and the court granted the motion.

¶81     Later that day, Juror 118 contacted a Tucson television station and gave an interview regarding the trial that largely repeated her allegations to the judge. Parts of that interview were broadcast the following day, during the 5:00 p.m., 6:00 p.m., and 10:00 p.m. local news.

¶82     The transcripts of both the television broadcasts and in-camera juror interviews reveal that Juror 118 had a distorted view of what constituted a violation of the admonition. Nothing in the record on these issues demonstrates a violation of the admonition.

        b.   *Witness "hugging" incident*

¶83     In addition to the juror misconduct allegation, Cruz's first motion for mistrial included an allegation that the jury was prejudiced by seeing a witness hug Hardesty family members after testifying.

¶84     Alejandro Ruiz lived at the residence where Officer

Hardesty was killed and was the first person to see Officer Hardesty's body. He directed police officers to it when they arrived. Ruiz also observed parts of Officer Waters' struggle with Cruz. At the conclusion of his testimony, Ruiz left the stand and met with Hardesty's family, who shook his hand and hugged him. Accounts conflict on whether this occurred in view of the jury.

¶85    We conclude that even if the jury observed this incident, Cruz suffered no undue prejudice from it. The State's counsel took steps to ensure that no similar incidents would occur.

¶86    Nothing about either the "jury misconduct" or the "hugging" incident warranted a mistrial. The trial court did not abuse its discretion by refusing to grant one.

   2.    Jury misconduct involving newspapers

¶87    Cruz moved for a mistrial on February 24, 2005, based on Juror 118's allegation that some jurors were reading a newspaper in the jury room. Defense counsel obtained the statement on February 10, but did not object based on it until February 24. The trial court denied the motion as untimely.

¶88    Following Juror 118's dismissal from the jury and subsequent interview with the television station, defense investigators interviewed her and she stated:

   Just, um, the second day we were there when we first

- 28 -

> got in there, uh, into the jury room. Um, one of the men said I saw it in the paper and I immediately said I don't want to hear it, uh, I was plugging my ears. And, and then he said oh, but I turned it – the paper over.

Nothing in this statement indicates that the paper contained any information about the case. Thus, not only was the motion untimely, but Cruz has not shown that he was prejudiced.

¶89 Other than the bailiff's discovery of an issue of the *Green Valley News* in the jury room, no other evidence was presented indicating that a juror might have been reading a newspaper. That Green Valley paper contained nothing about the trial, and counsel did not object when the trial court suggested throwing it away. There was no abuse of discretion in denying the motion for mistrial.

### 3. Murder weapon DNA evidence

¶90 On February 23, 2005, Cruz moved for a mistrial, claiming that he was denied a fair trial by "the State's ever-changing theory of prosecution," in violation of *State v. Blakley*, 204 Ariz. 429, 65 P.3d 77 (2003). The trial court denied the motion.

¶91 In 2003, Nora Rankin, senior criminalist and DNA analyst for the Tucson Police Department, tested the Taurus revolver used to kill Officer Hardesty for DNA evidence. She concluded that Cruz was excluded as a DNA contributor to the sample recovered from the Taurus. In 2004, the head of the

- 29 -

crime lab reviewed Rankin's notes and disagreed with her conclusions. The State promptly informed defense counsel of this issue. Rankin maintained her opinion that Cruz was excluded as a DNA donor. The State promptly informed defense counsel that Rankin's initial position would not change.

¶92 After learning of the conflicting opinions, Cruz retained two experts, Brian Wraxall, a DNA expert, and Joe Collier, a crime scene expert, to support Rankin's initial analysis that Cruz was excluded as a DNA donor. When Cruz was informed that Rankin's testimony would be unchanged, he did not withdraw Wraxall and Collier as witnesses.

¶93 Cruz did not call either witness: Wraxall, because he disagreed with Rankin that Cruz was excluded as a DNA donor, and Collier, because he had reviewed Rankin's notes and might also have discredited Rankin's conclusions. Based on this state of facts, Cruz moved for a mistrial, arguing that the possible change in Rankin's testimony constituted an "ever-changing theory of prosecution" that violated his right to notice of the State's theory under *Blakley*.

¶94 In *Blakley*, this Court held that the state's change in the predicate felony on which its felony murder case was based during closing arguments violated the defendant's right to a fair trial. *Id.* at 440, ¶ 55, 65 P.3d at 88. Such a situation is not presented here. Although the state may not change its

theory of the case after the close of evidence, nothing requires "that the defendant receive notice of how the State will prove his responsibility for the alleged offense." *State v. Arnett*, 158 Ariz. 15, 18, 760 P.2d 1064, 1067 (1988).

¶95 Additionally, the record simply does not support the assertion that the State changed theories. The State said that it would call Nora Rankin to testify and it did so. Her testimony never changed. Moreover, because Rankin testified that Cruz's DNA was not on the murder weapon, it is difficult to see how Cruz was prejudiced.[4] The trial court did not abuse its discretion by denying the motion for a mistrial.

### 4. Tara White testimony[5]

¶96 After the jury had found Cruz guilty of murder and had found the (F)(10) aggravator, Cruz's wife, Tara White, testified on his behalf during the penalty phase. Following her testimony, the court declared a recess. White informed defense counsel that, as the jury left the room, she overheard jurors saying, "I can't believe they're keeping us this long. They don't have a chance." The defense moved for a mistrial.

---

[4] Cruz arguably benefitted from this situation: Rankin was the only expert who testified regarding DNA, and her testimony excluded Cruz from the sample taken from the gun.

[5] Although White's testimony occurred during the penalty phase of the trial, Cruz's briefs raised his challenge relating to it in his list of mistrial motions. We therefore address the motion here.

¶97    The trial court conducted an inquiry, individually questioning every person who was seated near the witness stand when White testified.  None of the six people, including the court's bailiff, had heard what White claimed to have heard.  Out of an abundance of caution, the trial court submitted a written interrogatory to each juror asking if anyone had heard any such statement.  Each juror replied in the negative.  The court denied the motion for mistrial.

¶98    The trial court fully investigated the matter and responded appropriately.  Because it found no support for White's assertions, the trial court did not abuse its discretion by denying Cruz's motion for a mistrial.

5.    The gun expert's testimony

¶99    Cruz moved for a mistrial based on testimony by firearms expert Frank Powell that the spur on the hammer of the Taurus revolver used to kill Officer Hardesty had been removed and that the removal may have been done to facilitate concealment.

¶100    Cruz did not object to Powell's statement.  The following day, he moved for mistrial, claiming that Powell's testimony "implies bad character, bad conduct, a bad act, and that the person that possessed this weapon was engaging in criminal behavior."  The trial court denied the motion based on waiver and lack of merit.

¶101    Although we generally review the failure to grant a mistrial for an abuse of discretion, *Moody*, 208 Ariz. at 456, ¶ 124, 94 P.3d at 1151, when a defendant fails to contemporaneously object to testimony and later moves for mistrial based on that testimony, we review only for fundamental error, *id.* at 441, ¶ 40, 94 P.3d at 1136.

¶102    Cruz has failed to show that the snippet of testimony rendered his trial fundamentally unfair.  It is unlikely that the jury concentrated on the filed-off hammer on the Taurus when no evidence was presented that Cruz modified the gun and the trial was focused on other, more serious issues.  The mistrial motion was properly denied; no fundamental error occurred.

        6.   Post-verdict mistrial motion

¶103    Cruz moved for a mistrial after the guilt-phase verdict was read.  This motion simply restated his earlier arguments for mistrial, change of venue, and sequestration of the jury.  As addressed above, nothing in those motions merited a mistrial.  The trial court did not abuse its discretion by denying this renewed motion for a mistrial.

        7.   Intoxicated witness

¶104    On February 3, 2003, the State called Myra M. to testify.  She was visibly intoxicated.  Cruz's counsel initially objected to having her testify, but after discussion with the court and the prosecutor, withdrew his objection.  Cruz now

argues that the trial court erred by not postponing her testimony.

¶105    We review a trial court's ruling on the competency of a witness for an abuse of discretion. *Selby v. Savard*, 134 Ariz. 222, 227, 655 P.2d 342, 347 (1982). An objection that is withdrawn is waived, *see State v. Eastlack*, 180 Ariz. 243, 255, 883 P.2d 999, 1011 (1994), and we thus review only for fundamental error, *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2004).

¶106    We presume that a witness is competent to testify. *See* Ariz. R. Evid. 601. "[A] witness is not rendered incompetent to testify merely because [s]he was under the influence of drugs . . . at the time [s]he testifies." *State v. Jeffers*, 135 Ariz. 404, 420, 661 P.2d 1105, 1121 (1983). Although Myra M.'s testimony was somewhat rambling, it was coherent. Cruz has not shown that she was so intoxicated as to be incompetent to testify or that fundamental error occurred.

    8.    Coercion of the jury verdict

¶107    Cruz argues that the trial court coerced the penalty-phase jury verdict by giving an instruction that overbore the will of a holdout juror.

¶108    On March 8, 2005, after only three hours of deliberation on the penalty-phase verdict, the judge received a question from the jury foreperson, which read:

- 34 -

If one person's decision remains unchanged against the other 11 jurors [i]s this a hung jury?  If so what happens next?

¶109     Because the jury and counsel had already left for the day, the trial judge consulted with counsel telephonically, and suggested the following response:

1-   Yes.
2-   At this time I would ask you to continue your deliberations to attempt to resolve any differences.

¶110     Both attorneys initially agreed, but defense counsel soon called back expressing reservations regarding the answer to the second question.  Before responding to the jury, the judge held a hearing the next morning.  Ultimately, despite the objection, defense counsel eventually agreed that both answers were "at least a fair response" to the jurors' questions.  The court decided to give the responses quoted above, reasoning that the initial question was hypothetical.

¶111     On appeal, Cruz asserts that the jury impermissibly revealed the numerical breakdown and, as a result, any instruction suggesting further deliberation was impermissibly coercive.  He argues that the court should instead have asked the jurors whether further deliberations would be fruitful.

¶112     "In determining whether a trial court has coerced the jury's verdict," we examine the judge's actions and instructions in light of the "totality of the circumstances and attempt[] to determine if the independent judgment of the jury was

- 35 -

displaced." *State v. Huerstel*, 206 Ariz. 93, 97, ¶ 5, 75 P.3d 698, 702 (2003).  If a defendant objects to a further jury instruction, we review the trial judge's decision for an abuse of discretion, *State v. Ramirez*, 178 Ariz. 116, 126, 871 P.2d 237, 247 (1994), but reversible error occurs if a judge improperly coerces a verdict, *State v. McCrimmon*, 187 Ariz. 169, 172, 927 P.2d 1298, 1301 (1996).

¶113    We have addressed the propriety of jury instructions in possible deadlock situations several times.  In *Huerstel*, we found error in a capital murder trial when the trial court gave the instruction suggested in the comment to Arizona Rule of Criminal Procedure 22.4 to a jury that had been deliberating only three days and had given no indication that it was deadlocked.  206 Ariz. at 97-98, 101, ¶¶ 6-9, 25, 75 P.3d at 702-03, 706.  The prematurely given instruction, while error, did not, in itself, require reversal.  *Id.* at 99-100, ¶ 18, 75 P.3d at 704-05.  We found that additional circumstances, including two suggestions from the trial judge that a holdout juror should reconsider, together with the erroneous instruction, had "displaced the independent judgment of the jurors."  *Id.* at 101, ¶ 25, 75 P.3d at 706 (quoting *McCrimmon*, 187 Ariz. at 172, 927 P.2d at 1301).

¶114    Caution must be used when instructing a jury if the court knows of the numerical split between juror groups.  *State*

- 36 -

*v. Lautzenheiser*, 180 Ariz. 7, 9-10, 881 P.2d 339, 341-42 (1994) (suggesting that a single holdout juror may need to be "checked for bruises"); *State v. Roberts*, 131 Ariz. 513, 517-18, 642 P.2d 858, 862-63 (1982) (Feldman, J., dissenting).

¶115    Assuming, as the trial judge did, that the jurors in this case were still deliberating, asking them to continue deliberating does not constitute reversible error.    Even assuming the jury was deadlocked, no reversible error occurred in this case.    The instruction given did not improperly coerce or influence the jury.    It neither asks the jury to reach a verdict nor suggests that any juror should change his or her views.    The circumstances here thus differ from the overt pressuring of the holdout jurors in *Huerstel* and *Lautzenheiser*.

    9.    Shock belt

¶116    Cruz argues that his constitutional rights to due process and a fair trial were violated by requiring him to wear a "shock belt" under his shirt that enabled security personnel to deliver an electric shock if he attempted to escape or became violent.    Cruz does not claim that the belt was visible to jurors, but rather objects that it impeded his ability to communicate with counsel during proceedings.

¶117    In response to the objection, the court reviewed two reports detailing a possible escape attempt involving Cruz. When Cruz challenged the accuracy of the reports, the trial

judge offered to conduct an evidentiary hearing that afternoon to determine the necessity for the restraint, but Cruz's counsel was not prepared to proceed at that time. Finding a legitimate concern that Cruz presented an escape risk, the trial court denied Cruz's motion to have the belt removed. The judge informed Cruz that he would schedule an evidentiary hearing on the issue at Cruz's request, but Cruz never asked for a hearing.

¶118 Although a defendant generally has the right to be free from restraints in the courtroom, concerns for courtroom safety and security may make the use of restraints appropriate. Courtroom security procedures are left to the discretion of the trial court. *Davolt*, 207 Ariz. at 211, ¶ 84, 84 P.3d at 476. We will not disturb a trial court's decision on security measures unless an abuse of discretion is shown. *See id.* (citing *State v. McKinney*, 185 Ariz. 567, 576, 917 P.2d 1214, 1223 (1996)).

¶119 Nonetheless, a judge must have grounds for ordering restraints and should not simply defer to the prosecutor's request, a sheriff's department's policy, or security personnel's preference for the use of restraints. Rather, the judge should schedule a hearing at the defendant's request regarding the need for the restraints. *See State v. Stewart*, 139 Ariz. 50, 54, 676 P.2d 1108, 1112 (1984) (noting that when a defendant objects to restraints, "there must be support in the

record for the trial court's decision"). If such a need is shown, the restraints ordered should not be disproportionate to the security risk posed.

¶120 Cruz urges us to adopt instead the heightened standard employed in *Gonzalez v. Pliler*, 341 F.3d 897 (9th Cir. 2003). The court explained in that case that "[t]he fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely hinders a defendant's participation in the defense of the case, chilling [that] defendant's inclination to make any movements during trial — including those movements necessary for effective communication with counsel." *Id.* at 900 (quoting *United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir. 2002)) (internal quotation marks omitted). The court therefore stated that, before a shock belt may be employed, the government must show not only compelling circumstances that one is necessary, but also that a less restrictive alternative will not suffice to ensure courtroom security. *Id.*

¶121 Although we share these concerns about the use of shock belts, we decline to adopt the standard articulated in *Pliler*. We adhere to settled Arizona law that leaves determinations regarding courtroom security to the trial judge's discretion. *See Davolt*, 207 Ariz. at 211, ¶ 84, 84 P.3d at 476. A trial judge's independent determination that use of the belt

- 39 -

is appropriate and supported by the record will not be disturbed absent an abuse of discretion. *Id.*

¶122    Given the constitutional ramifications of the use of shock belts, courts should provide a hearing — evidentiary if necessary — at which the defendant may contest the use of shock belts or other restraints.  In this case, the trial court properly offered Cruz an evidentiary hearing, but Cruz declined. The court's decision was based on a documented threat of escape, not merely on security personnel's preference for the shock belt.  There was no abuse of discretion.

    10.  Autopsy photograph

¶123    Cruz argues that the trial court abused its discretion by admitting into evidence Exhibit 58, a large autopsy photograph of Hardesty's head wound.  He claims the photograph was "gruesome" and inflammatory.

¶124    The photograph shows the entrance wound in Hardesty's left eye and demonstrates the "stippling" effect that supported the pathologist's conclusion that, when fired, the murder weapon was approximately twelve inches from Hardesty.  Photographs depicting Hardesty's other wounds were admitted without objection.

¶125    The admissibility of a potentially inflammatory photograph is determined by examining (1) the relevance of the photograph, (2) its "tendency to incite or inflame the jury,"

and (3) the "probative value versus potential to cause unfair prejudice." *State v. Spreitz*, 190 Ariz. 129, 141, 945 P.2d 1260, 1272 (1997) (quoting *Murray*, 184 Ariz. at 28, 906 P.2d at 561). We review the trial court's decision to admit a photograph for an abuse of discretion. *Id.; Gretzler*, 126 Ariz. at 86, 612 P.2d at 1049.

¶126 In murder cases, "[n]otwithstanding an offer to stipulate to the cause of death, photographs of a murder victim are relevant if they help to illustrate what occurred." *State v. Rienhardt*, 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997). The photograph here was relevant to assist the jury "because the fact and cause of death are always relevant in a murder prosecution." *Spreitz*, 190 Ariz. at 142, 945 P.2d at 1273 (quoting *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983)).

¶127 Exhibit 58 itself was not particularly inflammatory. The photograph shows the wound "cleaned up," and we agree with the trial judge that "it doesn't show a lot more than a person with a black eye." "There is nothing sanitary about murder, and there is nothing in Rule 403, Ariz. R. Evid., that requires a trial judge to make it so." *Rienhardt*, 190 Ariz. at 584, 951 P.2d at 459. The trial court did not abuse its discretion by admitting the photograph.

## D.    Penalty Phase Issues

### 1.    Double counting an element of the crime

¶128    Cruz argues that the victim's status as a police officer was "double counted" because that fact was used to elevate the murder from second to first degree murder and also to render the Defendant death eligible.

¶129    This case is unique in that the State did not allege premeditation or felony murder; the only first degree murder theory charged was the (A)(3) murder:

> Intending or knowing that the person's conduct will cause death to a law enforcement officer, the person causes the death of a law enforcement officer who is in the line of duty.

A.R.S. § 13-1105(A)(3) (2004).    The only aggravating circumstance was the (F)(10) aggravator:

> The murdered person was an on duty peace officer who was killed in the course of performing the officer's official duties and the defendant knew, or should have known, that the murdered person was a peace officer.

A.R.S. § 13-703(F)(10) (2004).[6]    Despite their different wording, §§ 13-1105(A)(3) and 13-703(F)(10) require proof of nearly identical facts.    To commit first degree murder, a defendant

---

[6]    The Legislature added § 13-1105(A)(3) in 1996.    1996 Ariz. Sess. Laws, ch. 343, § 2 (2d Reg. Sess.).    In the only other case this Court has reviewed since 1996 concerning the murder of a police officer, an additional aggravator was proved.    *See State v. Martinez*, 196 Ariz. 451, 461, ¶ 39, 999 P.2d 795, 805 (2000).

must intend to kill a person he knows to be a law enforcement officer who is acting in the line of duty. Nothing more is required to prove the (F)(10) aggravating circumstance, which renders a defendant eligible for a death sentence.

### a. State v. Lara

¶130    Cruz fails to articulate how applying the (F)(10) aggravating factor violates the constitution, aside from urging us to overrule *State v. Lara*, 171 Ariz. 282, 830 P.2d 803 (1992). He presents no compelling rationale for doing so. In *Lara*, we held that an element of a crime may also be used to aggravate a sentence. *Id.* at 284-85, 830 P.2d at 805-06. We have repeatedly applied the *Lara* rule in the capital context. *See State v. Greene*, 192 Ariz. 431, 444, ¶ 62, 967 P.2d 106, 119 (1998); *State v. Lee*, 189 Ariz. 608, 620, 944 P.2d 1222, 1234 (1997). We decline Cruz's invitation to overrule *Lara*.

### b. *Presumptive death sentence*

¶131    Cruz argues that any defendant who is convicted of murder under A.R.S. § 13-1105(A)(3) will also have committed the § 13-703(F)(10) aggravating factor because one cannot satisfy § 13-1105(A)(3) without also satisfying the elements of the (F)(10) aggravating circumstance. From this, Cruz concludes that the "presumptive sentence" for violating A.R.S. § 13-1105(A)(3) is death.

¶132    We addressed a similar "presumption of death" claim in

- 43 -

*State ex rel. Thomas v. Granville (Baldwin)*, which held that no presumption of death arises when an aggravating circumstance is found because a jury may sentence a death-eligible defendant to life in prison "even if the defendant decides to present no mitigation evidence at all." 211 Ariz. 468, 471, ¶ 12, 123 P.3d 662, 665 (2005). The same is true here. A conviction under A.R.S. § 13-1105(A)(3) makes a defendant death eligible (if the (F)(10) aggravating factor has been alleged and found), but, as with all cases in which an aggravating circumstance is found, no presumption arises that a capital sentence should be imposed. Moreover, Cruz cites no authority suggesting that the legislature may not provide that any intentional killing of an on-duty peace officer should make a defendant death eligible. Killing a person one knows to be a peace officer who is acting in the line of duty adequately narrows the class of persons subject to the death penalty. *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (holding that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty'"). Cruz has shown no inherent constitutional problem with the (A)(3) murder and (F)(10) aggravating factor.

2.    Residual doubt jury instruction

**¶133**    Cruz argues that Arizona law requires the trial court to give a requested jury instruction on residual doubt. We have

previously held, however, that a residual doubt instruction is not required by Arizona law. *See State v. Garza*, 216 Ariz. 56, 70, ¶ 67, 163 P.3d 1006, 1020 (2007). In this case, the jury was adequately instructed regarding mitigation. The trial court did not abuse its discretion by refusing to give the requested instruction.

### III. REVIEW OF SENTENCE

¶**134** For crimes committed after August 1, 2002, we review death sentences to determine whether the jury abused its discretion. A.R.S. § 13-703.05 (2004).

¶**135** Aside from the matters addressed earlier in this opinion, Cruz does not challenge anything that occurred at the aggravation and penalty phases of his trial. We nonetheless review the sentence for an abuse of discretion. *See* A.R.S. § 13-703.05 (requiring Court to review all capital sentences for abuse of discretion); *Morris*, 215 Ariz. at 340, ¶ 76, 160 P.3d at 219 (requiring review even if defendant raises no claims).

¶**136** The only aggravating factor in this case was the (F)(10) factor, murder of a peace officer. Cruz never contested that he knew Officer Hardesty was a police officer and that Hardesty was acting in the line of duty when he was killed. The jury did not abuse its discretion by finding the (F)(10) aggravator.

¶**137** Cruz alleged seventeen mitigating factors: (1)

impaired capacity to appreciate the wrongfulness of his conduct, (2) impaired capacity to conform his conduct to the law, (3) unusual and substantial duress, (4) unforseeability that the acts would cause death, (5) dysfunctional family, (6) deprivation of "necessary nurturing and love" from family, (7) family history of mental disorders, (8) post-traumatic stress disorder ("PTSD"), (9) drug addiction, (10) mental state affected by family history of mental disorders, PTSD, and drug addiction, (11) unfavorable impact on Cruz's family, (12) existence of family support, (13) compliance with prison rules, (14) lack of propensity for future violence, (15) capability to adapt to prison life, and (16) lack of plan to commit the murder. Finally, he asserts that his "upbringing, life-style and subculture all made it far more likely that he would find himself in this position." The jury did not find the proffered mitigation sufficiently substantial to call for leniency.

¶138    Although Cruz's early life was certainly not ideal, absent is the type of horrible abuse often found in our capital jurisprudence. Cruz was neither suffering from any significant mental illness nor under the influence of drugs at the time of the crime. The evidence presented on most of these mitigating circumstances was weak, and Cruz established little or no causal relationship between the mitigating circumstances and the crime. Moreover, much of the mitigating evidence offered by Cruz was

- 46 -

effectively rebutted by the State.  The jury did not abuse its discretion by determining that Cruz should be sentenced to death.

## IV.  CONCLUSION

**¶139**     Cruz's conviction and death sentence are affirmed.


_____
Rebecca White Berch, Vice Chief Justice


CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice


_____
W. Scott Bales, Justice

**Issues Raised to Avoid Preclusion**

Cruz raises the following twenty-one challenges to the constitutionality of Arizona's death penalty scheme to avoid preclusion:

1.    The death penalty is cruel and unusual punishment under any circumstances.    This argument was rejected by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 187 (1976), and by this Court in *State v. Harrod*, 200 Ariz. 309, 320, ¶ 59, 26 P.3d 492, 503 (2001), *vacated on other grounds by Harrod v. Arizona*, 536 U.S. 953 (2002).

2.    Aggravating factors under A.R.S. § 13-703(F) are elements of capital murder and must be alleged in an indictment and screened for probable cause.    This Court rejected this argument in *McKaney v. Foreman*, 209 Ariz. 268, 271, ¶ 13, 100 P.3d 18, 21 (2004).

3.    Victim impact evidence is unconstitutional because of the lack of prior notice and inability to cross examine the evidence.    In *Lynn v. Reinstein*, 205 Ariz. 186, 188, ¶ 6, 68 P.3d 412, 414 (2003), this Court found it permissible under the Victim's Bill of Rights to allow victims to offer testimony regarding the victim and the impact of the crime on the victim and the victim's family.

4.    The trial court erred by refusing to instruct the jury

that it may consider mercy or sympathy in deciding mitigation. This Court rejected this claim in *State v. Andriano*, 215 Ariz. 497, 507, ¶¶ 47-49, 161 P.3d 540, 550 (2007), and *State v. Carreon*, 210 Ariz. 54, 70-71, ¶¶ 81-87, 107 P.3d 900, 916-17 (2005).

5. The death penalty is imposed arbitrarily and irrationally in Arizona. This Court rejected this argument in *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

6. Application of the death penalty on the facts of this case would constitute cruel and unusual punishment. No argument or authority is presented to support this claim.

7. The prosecutor's discretion to seek the death penalty is not channeled by standards. This Court rejected this argument in *State v. Sansing*, 200 Ariz. 347, 361, ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds by Sansing v. Arizona*, 536 U.S. 954 (2002).

8. Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of the Arizona Constitution. This argument was rejected in *Sansing*, 200 Ariz. at 361, ¶ 46, 26 P.3d at 1132, *vacated on other grounds by Sansing v. Arizona*, 536 U.S. 954 (2002).

9. The absence of proportionality review of death sentences by Arizona courts denies capital defendants due

process of law and equal protection and amounts to cruel and unusual punishment. This Court rejected this argument in *Harrod*, 200 Ariz. at 320, ¶ 65, 26 P.3d at 503, *vacated on other grounds by Harrod v. Arizona*, 536 U.S. 953 (2002), and *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995).

10. Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate. This Court rejected this argument in *State v. Ring* (*Ring I*), 200 Ariz. 267, 284, ¶ 64, 25 P.3d 1139, 1156 (2001), *rev'd on other grounds by Ring II*, 536 U.S. at 584.

11. Arizona Revised Statutes § 13-703 provides no objective standards to guide the sentencer in weighing the aggravating and mitigating circumstances. This Court rejected this argument in *State v. Pandeli* (*Pandeli I*), 200 Ariz. 365, 382, ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds by Pandeli v. Arizona* (*Pandeli II*), 536 U.S. 953 (2002).

12. Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. This Court rejected this argument in *State v. Poyson*, 198 Ariz. 70, 83, ¶ 59, 7 P.3d 79, 92 (2000).

13. Arizona Revised Statutes § 13-703 does not

- 50 -

sufficiently channel the sentencer's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder. This Court rejected this argument in *Pandeli I*, 200 Ariz. at 382, ¶ 90, 26 P.3d at 1153, *vacated on other grounds by Pandeli II*, 536 U.S. at 953.

14. Execution by lethal injection is cruel and unusual punishment. This Court rejected this argument in *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

15. Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance exists and there is no mitigation sufficiently substantial to call for leniency. This Court rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

16. Arizona's death penalty statute is unconstitutional because it requires defendants to prove that their lives should be spared, in violation of the United States and Arizona Constitutions. The Court rejected this argument in *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

17. Arizona's death penalty is unconstitutional because it fails to require the sentencer to consider the cumulative nature

of mitigation, nor does it require the sentencer to make specific findings as to each mitigating factor, in violation of the Eighth and Fourteenth Amendments of the United States Constitution. This Court rejected this argument in *State v. Van Adams*, 194 Ariz. 408, 423, ¶ 55, 984 P.2d 16, 31 (1999).

18. Arizona's statutory scheme for considering mitigation evidence is unconstitutional because it limits full consideration of that evidence. This Court rejected this argument in *State v. Mata*, 125 Ariz. 233, 241-42, 609 P.2d 48, 56-57 (1980).

19. Section 13-703[7] is unconstitutional because there are no statutory standards for weighing. This Court rejected this argument in *Atwood*, 171 Ariz. at 645-46 n.21, 832 P.2d at 662-63 n.21.

20. Arizona's death penalty provides no meaningful distinction between capital and non-capital cases. This Court rejected this argument in *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

21. Application of the death penalty statutes promulgated after *Ring II*, 536 U.S. at 584, violates the prohibition against ex post facto laws. The changes altered the rules of evidence to permit different testimony than that required at the time of

---

[7] Cruz does not specify the statute to which he refers, but we assume that it is A.R.S. § 13-703.

the offense.  This Court rejected this argument in *State v. Ring*

(*Ring III*), 204 Ariz. 534, 547, ¶ 23, 65 P.3d 915, 928 (2003).