672 P.2d 470

STATE of Arizona, Appellee,

v.

Robert Charles CRUZ, Appellant.

No. 5483.

Supreme Court of Arizona,
In Banc.

Oct. 6, 1983.

Reconsideration Denied Nov. 15, 1983.

Robert K. Corbin, Atty. Gen., William J. Schafer III, Chief Counsel, Crim. Division, Gerald R. Grant, Asst. Atty. Gen., Phoenix, for appellee.

J. Douglas McVay, Phoenix, for appellant.

GORDON, Vice Chief Justice:

On December 10, 1981, a jury found appellant guilty of one count of conspiracy to commit first degree murder, two counts of first degree murder, one count of attempted first degree murder, three counts of kidnapping, three counts of armed robbery and one count of first degree burglary. On

January 11, 1982, appellant was sentenced to life imprisonment for conspiracy to commit first degree murder, death for each count of first degree murder, twenty-one years imprisonment for attempted first degree murder, twenty-one years imprisonment for each count of kidnapping, twenty-one years imprisonment for each count of armed robbery, and twenty-one years imprisonment for first degree burglary. This Court has jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 13–4031. The judgments of conviction and sentences as to all counts are reversed.

The evidence adduced at trial, viewed in the light most favorable to upholding the verdict, indicated that Pat Redmond and Ron Lukezic were partners in a successful printing business called Graphic Dimensions. In the summer of 1980 Graphic Dimensions was presented with the possibility of some lucrative printing contracts with certain Las Vegas hotels.

In September of 1980 appellant asked Arnold Merrill if he would be willing to kill Pat Redmond for $10,000. Merrill declined. Appellant wanted Pat Redmond killed in order to get Redmond's interest in Graphic Dimensions. Appellant ultimately planned to have Ron Lukezic killed as well and take complete control of Graphic Dimensions.

In early December of 1980 appellant and Merrill went to the Phoenix Airport and picked up William Bracey and Murray Hooper who arrived on a flight from Chicago. After staying in a motel for a day or two Bracey and Hooper moved into Merrill's house where they were introduced to Ed McCall. A few days later Bracey, Hooper and Merrill followed Pat Redmond's car as Redmond left a bar. When they neared Redmond's car Hooper attempted to shoot Redmond. The attempt failed when Merrill, who was driving, swerved the car. After the failed attempt Bracey and Hooper moved out of Merrill's home. On December 8, 1980, McCall told Merrill he was joining up with Bracey and Hooper. Bracey and Hooper returned to Chicago shortly thereafter.

Bracey and Hooper came to Phoenix again on December 30, 1980. On the evening of December 31, Bracey, Hooper and McCall went to the Redmond home and forced their way in at gunpoint. Pat Redmond, his wife Marilyn, and Marilyn Redmond's mother Helen Phelps were present. The Redmonds and Mrs. Phelps were herded into the master bedroom where they were relieved of their valuables, bound with surgical tape, and gagged. They were then forced to lie on the bed where they were each shot in the head. Pat Redmond's throat was also cut. Pat Redmond and Mrs. Phelps died from their wounds but Marilyn Redmond lived.

Appellant was tried with McCall. Merrill was the state's key witness. The state's theory of the case was that appellant hired Bracey, Hooper and McCall to kill Pat Redmond. Appellant argued that the killings were the result of a robbery committed by Bracey, Hooper and McCall. McCall, along with the state, argued that the killings were a paid gangland-style execution ordered by appellant. McCall, however, claimed he was not involved. Both defendants were convicted. Appellant raises a number of issues on appeal.

## DENIAL OF MOTION TO SEVER

Prior to trial appellant moved to sever his trial from co-defendant McCall's arguing that McCall's defense was so antagonistic to his that he could not get a fair trial if they were tried together. The motion was denied. Appellant re-urged the motion numerous times during the trial without success. He now claims the denial of the motion to sever was reversible error. We agree.

A trial court is required to grant a defendant's motion to sever if necessary to promote a fair determination of guilt or innocence of any defendant, or if the court detects the presence or absence of unusual features of the crime or case that might prejudice the defendant. *State v. McGill,* 119 Ariz. 329, 580 P.2d 1183 (1978); *State v. Dale,* 113 Ariz. 212, 550 P.2d 83 (1976); *State v. Druke,* 115 Ariz. 224, 564 P.2d 913

(App.1977). The decision to grant or deny a motion to sever is within the sound discretion of the trial court and will be reversed only if that discretion is abused. *State v. Johnson,* 122 Ariz. 260, 594 P.2d 514 (1979); *State v. McGill, supra; see United States v. Badolato,* 701 F.2d 915 (11th Cir.1983); *United States v. Riola,* 694 F.2d 670 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 1532, 75 L.Ed.2d 953 (1983). In deciding whether to grant a severance the court must balance the possible prejudice to the defendant against interests of judicial economy. *United States v. Sheikh,* 654 F.2d 1057 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); *State v. Druke, supra.* In challenging a trial court's failure to sever, a defendant must demonstrate compelling prejudice against which the trial court was unable to protect. *United States v. Bovain,* 708 F.2d 606 (11th Cir.1983); *United States v. Riola, supra; United States v. Madison,* 689 F.2d 1300 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983).

This Court has not specifically addressed the question of when the existence of antagonistic defenses becomes so prejudicial that severance is required. There is, however, much authority on the question from the United States Courts of Appeal. It appears well settled that the mere presence of hostility between co-defendants, or the desire of each co-defendant to avoid conviction by placing the blame on the other does not require severance. *United States v. Riola, supra; United States v. Nichols,* 695 F.2d 86 (5th Cir.1982); *United States v. Berkowitz,* 662 F.2d 1127 (5th Cir.1981); *United States v. Lutz,* 621 F.2d 940 (9th Cir.), *cert. denied,* 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1980); *United States v. Boyd,* 610 F.2d 521 (8th Cir.1979), *cert. denied sub nom. Clark v. United States,* 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980); *United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *cert. denied sub nom. Ehrlichman v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Ehrlichman,* 546 F.2d 910 (D.C.Cir. 1976), *cert. denied,* 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977). Before severance is required, defenses must be irreconcilable; they must be antagonistic to the point of being mutually exclusive. *United States v. Bovain, supra; United States v. Badolato, supra; United States v. Riola, supra; United States v. Madison, supra; United States v. Nichols, supra; United States v. Barnes,* 681 F.2d 717 (11th Cir.), *modified on other grounds,* 694 F.2d 233 (11th Cir.1982), *cert. denied sub nom. Riddle v. United States,* —— U.S. ——, 103 S.Ct. 1447, 75 L.Ed.2d 802 (1983); *United States v. Berkowitz, supra; United States v. Boyd, supra; United States v. Haldeman, supra.*

The most complete discussion of what it means for defenses to be mutually exclusive appears in *United States v. Berkowitz, supra.* In *Berkowitz,* the court analyzed and attempted to synthesize prior decisions dealing with the question of severance on the grounds of mutually exclusive defenses. The *Berkowitz* court concluded that defenses are mutually exclusive and, therefore, severance is required "if the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." 662 F.2d at 1134. *See United States v. Badolato, supra; United States v. Riola, supra; United States v. Moschiano,* 695 F.2d 236 (7th Cir.1982); *United States v. Banks,* 687 F.2d 967 (7th Cir.1982), *cert. denied sub nom. McCruiston v. United States,* —— U.S. ——, 103 S.Ct. 1208, 75 L.Ed.2d 448 (1983); *United States v. Ziperstein,* 601 F.2d 281 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).

■ We believe the approach adopted by the above-cited decisions strikes a proper balance between a defendant's interest in a fair trial and considerations of judicial economy. It is natural that defendants accused of the same crime and tried together will attempt to escape conviction by pointing the finger at each other. Whenever this occurs the co-defendants are, to some extent, forced to defend against their co-defendant as well as the government. This situation results in the sort of compelling prejudice requiring reversal, however, only

when the competing defenses are so antagonistic at their cores that both cannot be believed. Consequently, we hold that a defendant seeking severance based on antagonistic defenses must demonstrate that his or her defense is so antagonistic to the co-defendants that the defenses are mutually exclusive. Moreover, defenses are mutually exclusive within the meaning of this rule if the jury, in order to believe the core of the evidence offered on behalf of one defendant, must disbelieve the core of the evidence offered on behalf of the co-defendant.

■ Applying this test to the instant case, we find that the defenses advanced by appellant and his co-defendant did not require severance. The core of appellant's defense was that he was not involved in the killings. In support of that theory appellant attacked the credibility of the state's key witness, Arnold Merrill, and presented evidence in an effort to minimize his own association with the killers from Chicago. He also presented evidence attacking the state's theory that he ordered the killings to obtain an interest in Graphic Dimensions and thereby participate in the profits from lucrative printing contracts with Las Vegas hotels. As a further defense tactic, he argued that the killings were the result of a robbery in which McCall and others had participated.

Similarly, the core of McCall's defense was that he was not involved in the killings. In support of that theory, McCall attacked Marilyn Redmond's identification of him and challenged the credibility of Merrill.[1] He admitted that he had taken part in some burglaries but claimed he was not a killer. He also argued that the manner in which the victims were killed indicated that the motive for the killing was not robbery. The killings were, he argued, executions which someone else, possibly appellant, had ordered.

While the alternative motives offered by the co-defendants—robbery as opposed to execution—were mutually exclusive, the core of each defense was not. The core of each defendant's defense was his own non-involvement; the "I didn't do it; he did it" stance of each defendant was peripheral to this core. Thus, the jury could have believed the core of the evidence offered by either defendant without disbelieving the core of the evidence offered by the other. Both defendants could have been found innocent. The jury could have believed McCall's claim that the killing was a hired execution in which he was not involved and, at the same time, believed appellant's claim that, he, appellant, had no motive to and did not order the execution. On the other hand, the jury could have believed appellant's claim that the motive for the killing was robbery and, at the same time, believed McCall's claim that Marilyn Redmond's identification of him was unreliable and that he, McCall, was not involved. Indeed, the jury could have rationally accepted the defense theory of both, or only one, or of neither defendant. The defenses were not mutually exclusive. Consequently, the nature of the defenses did not require severance.

■ Even in a case where the nature of the defenses do not compel a severance, a defendant may be prejudiced by the actual conduct of his or her co-defendant's defense. *United States v. Ziperstein, supra.* We are convinced that this occurred in the instant case.

■ In the course of cross-examining Merrill, McCall elicited testimony indicating that appellant had been involved in other criminal activity. In response to questions by McCall's counsel Merrill stated that he had heard that appellant had affiliations with organized crime, that he heard that appellant had once hired two people from Chicago to kill him, Merrill, that appellant had asked him, Merrill, to break someone's legs, and that he, Merrill, had arranged for

---

1. In the process of attacking Merrill's credibility, McCall elicited some evidence highly favorable to appellant. Merrill testified on direct examination that he and Mike Gill went to

appellant's home and appellant tried to hire Merrill to kill Pat Redmond. McCall called Mike Gill as a witness and Gill testified that no such meeting ever occurred.

someone to burn a building at appellant's request.

The line of questioning that resulted in this testimony was designed to test Merrill's direct testimony that he was afraid of appellant. The testimony concerning affiliations with organized crime and appellant hiring someone to kill Merrill was admitted with an admonition that it was to be considered only for the purpose of evaluating Merrill's state of mind. The testimony concerning appellant arranging to have someone's legs broken was not accompanied by such an admonition. The testimony concerning appellant arranging to burn a building was ruled to be irrelevant and stricken from the record.

The questioning by McCall's counsel was proper cross-examination. He had every right to explore Merrill's purported fear of appellant. *See State v. Dunlap,* 125 Ariz. 104, 608 P.2d 41 (1980). The result, however, was the admission of testimony suggesting that appellant was linked with organized crime and that he had, in the past, hired people to commit crimes, including murder. This evidence would not have come out if appellant had not been tried with McCall and it would not have been admissible in the state's case at a separate trial. The potential prejudice to appellant, who stood accused of ordering a gangland-style murder, was great. Furthermore, the trial judge's admonitions were not sufficient to protect against the prejudice because they were incomplete. They were incomplete in that none of them covered the testimony concerning appellant arranging to have someone's legs broken.

When this testimony was elicited the trial judge should have either ordered a mistrial as to appellant and severed him from McCall, as appellant's counsel requested, or taken sufficient measures to protect against the prejudice. Because the trial court did not sever appellant from McCall, appellant suffered prejudice against which the trial court did not provide sufficient protection. Consequently, his convictions and sentences must be reversed. *Cf. State v. Robison,* 125 Ariz. 107, 608 P.2d 44 (1980) (where cross-examination of key witness by co-defendant at joint trial may result in admission of evidence of other crimes by defendant, separate trials may be necessary to promote a fair determination of guilt or innocence).

Because a retrial is likely we feel it necessary to address several other issues raised by appellant.

### EVIDENCE OF BAD CHARACTER

Appellant argues that evidence of other crimes or bad acts was improperly admitted at his trial. Much of this evidence was introduced through McCall's cross-examination of Merrill and was discussed above. Part of this evidence came out in non-responsive answers to prosecution questions or on re-direct examination by the prosecutor after appellant opened the door to the subject. This evidence is unlikely to come out in the event of a retrial and need not be discussed. Two pieces of evidence suggesting appellant's involvement in other criminal activity do require discussion.

Merrill testified that in a conversation between them, appellant said he was going to take over half of Graphic Dimensions by killing Pat Redmond, then, six months later, take over the rest of the business by killing Ron Lukezic. Later Merrill testified about a conversation involving himself, Bracey, Hooper, McCall and a friend of theirs. During that conversation Bracey and Hooper indicated that they were interested in setting up a drug business in south Phoenix. Bracey said that they would need appellant's permission for a move like that. During cross-examination by McCall, Merrill testified that Bracey and Hooper could not take any action, including setting up a drug business, without appellant's permission. We hold that this evidence was properly admitted.

Evidence linking a defendant to criminal activity other than that for which he or she is on trial is not admissible to prove that the defendant is of bad character. *State v. Sullivan,* 130 Ariz. 213, 635 P.2d 501 (1981); Ariz.R.Evid. 404(b). Such evidence is admissible to show the defend-

ant's plan, *State v. Jackson,* 124 Ariz. 202, 603 P.2d 94 (1979); *State v. Rose,* 121 Ariz. 131, 589 P.2d 5 (1978), or to show the complete story of the crime. *State v. Mincey,* 130 Ariz. 389, 636 P.2d 637 (1981), *cert. denied* 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982). *State v. Price,* 123 Ariz. 166, 598 P.2d 985 (1979); *see United States v. White,* 645 F.2d 599 (8th Cir.) *cert. denied,* 452 U.S. 943, 101 S.Ct. 3092, 69 L.Ed.2d 959 (1981).

 We find that the evidence at issue falls within one or both of these exceptions. The evidence concerning appellant's plan to kill Ron Lukezic and obtain control of Graphic Dimensions is proof of appellant's plan and helps complete the story of the crime by indicating appellant's ultimate goal in the conspiracy. With respect to the evidence indicating that Bracey and Hooper needed appellant's permission to do anything, including set up a drug business in Phoenix, we note that in context it did not tend to paint appellant as controlling or involved in drug traffic. Rather, it painted him as controlling Bracey and Hooper. As such it helped complete the story of the crime in that it helped establish and explain the nature of the relationship between appellant and two of his co-conspirators. *See State v. Wilson,* 134 Ariz. 551, 658 P.2d 204 (App.1982).

## PHOTOGRAPHS

Appellant argues that the admission of seven specified photographs was error because their prejudicial effect outweighed their probative value. As the matter is being remanded for a new trial, we need not determine whether any actual prejudice resulted from their admission. We do note that some of these particular photographs are arguably gruesome and could, therefore, be properly excluded. *State v. Steele,* 120 Ariz. 462, 586 P.2d 1274 (1978). Depending on what other photographs are admitted at appellant's new trial, some of these photographs may be cumulative and may be properly excluded on that ground.

2. The parties do not raise and we express no opinion with respect to the question of whether

*State v. Altamirano,* 116 Ariz. 291, 569 P.2d 233 (1977). It will be for the trial court on remand to consider not only the possible prejudicial or inflammatory effect of these pictures but also their probative value.

## CO–CONSPIRATOR'S ADMISSIONS

 At appellant's trial Morris Nellum, an associate of Bracey and Hooper, was allowed to testify about statements made by Bracey and Hooper in early January of 1981. The trial court allowed the statements to be admitted finding that they were not hearsay by virtue of Ariz.R.Evid. 801(d)(2)(E).

Under Ariz.R.Evid. 801(d)(2)(E) a statement is not hearsay if it "is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Appellant argues that the statements at issue are not within 801(d)(2)(E) because they were not made in the course of the conspiracy. They were not made in the course of the conspiracy, he argues, because they were made after the commission of the substantive crime that was the object of the conspiracy, the murder of Pat Redmond.[2] A conspiracy usually ends when the substantive crime that is the object of the conspiracy is either committed or threatened. *State v. Darby,* 123 Ariz. 368, 599 P.2d 821 (App.1979); *State v. Howard,* 324 N.W.2d 216 (Minn.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 818, 74 L.Ed.2d 1016 (1983). In some cases, however, the object of the conspiracy includes more than the commission of a substantive offense. In such cases the conspiracy may continue after the commission of the substantive offense. *State v. Darby, supra. See, United States v. Testa,* 548 F.2d 847 (9th Cir.1977); *Atkins v. United States,* 307 F.2d 937 (9th Cir.1962). For example, where a conspiracy embraces payment as its last term, it is "too easy to argue that the conspiracy was at an end when the object of the conspiracy * * * was realized," *United States v. Kahan,* 572 F.2d 923, 935 (2d Cir.), *cert. denied* 439 U.S.

the statements were made in furtherance of the conspiracy.

833, 99 S.Ct. 112, 58 L.Ed.2d 128 (1978). Reaching the same conclusion in a murder-for-hire case, the Texas Court of Criminal Appeals held that:

"The conspiracy in the instant case did not terminate upon the completion of the murder. It was contemplated by the conspirators that Smith would receive compensation for the job. [At the time the complained of statements were made], Smith had not yet received all the compensation agreed upon * * *. We find that the object of the conspiracy had not been completed. [Citations omitted]."

May v. State, 618 S.W.2d 333, 346 (Tex.Cr. App.), vacated on other grounds, 454 U.S. 959, 102 S.Ct. 497, 70 L.Ed.2d 374 (1981). See also State v. Howard, supra (conspiracy in murder-for-hire situation uncompleted while part of fee was traveling in the mails); People v. Saling, 7 Cal.3d 844, 500 P.2d 610, 103 Cal.Rptr. 698 (1972) (as payment for murder-for-hire had not yet occurred, the conspiracy continued and statements made were admissible). We believe this to be a wise approach and find it applicable to the case at hand. According to the state's theory, Bracey's and Hooper's primary purpose for killing Pat Redmond was the money offered by appellant. The transfer of the money by appellant to them was one of the main objectives of the conspiracy as far as they were concerned. At the time the statements at issue were made, the transfer had not been accomplished and the parties, including appellant, were still attempting to accomplish the transfer. Consequently, the conspiracy had not terminated and the statements were made in the course of the conspiracy.

## NON–PARTICIPATION OF DEFENSE COUNSEL

Though it is unlikely to recur we feel compelled to discuss an incident that took place at appellant's trial. Approximately three weeks after the trial began, after the state had rested and appellant began presenting his case, appellant's trial counsel became convinced that the trial judge was prejudiced against appellant. He indicated in chambers that he intended to file a motion for change of judge for cause under Ariz.R.Crim.P. 10.1.[3] He also stated that he did not feel it was appropriate to proceed with the trial until the matter was resolved. The trial judge stated that he was not sure whether the filing of the motion deprived him of jurisdiction or not and he ordered a recess to allow defense counsel an opportunity to prepare and file a motion. After the recess, during which trial counsel filed the motion, the following exchange occurred.

"THE COURT:

\* \* \* \* \* \*

"Record may also show Mr. Feldhacker has a few moments ago filed with the courtroom Clerk of this Court the document entitled Notice of Change of Judge for Cause. Attached thereto is his affidavit.

"Since counsel advised the Court about an hour ago of his intentions to so file,

---

**3.** Rule 10.1 provides:

"**Change of judge for cause**

"**a. Grounds.** In any criminal case prior to the commencement of a hearing or trial the state or any defendant shall be entitled to a change of judge if a fair and impartial hearing or trial cannot be had by reason of the interest of procedure of the assigned judge.

"**b. Procedure.** Within 10 days after discovery that grounds exist for change of judge, but not after commencement of a hearing or trial, a party may file a motion verified by affidavit of the moving party and alleging specifically the grounds for the change. Except for the commencement of a hearing or trial, no event occurring before the discovery shall constitute a waiver of rights to change of judge for cause. Allegations of interest or prejudice which prevent a fair and impartial hearing or trial may be preserved for appeal.

"**c. Hearing.** Promptly after the filing of the motion, the presiding judge shall provide for a hearing on the matter before a judge other than the judge challenged. The hearing judge shall decide the issues by the preponderance of the evidence and following the hearing, shall return the matter to the presiding judge who shall as quickly as possible assign the action back to the original judge or make a new assignment, depending on the findings of the hearing judge. If a new assignment is to be made it shall be made in accordance with the provisions of this rule."

the Court has had a full and complete opportunity to review the authorities cited by counsel and Rule 10.1 of the Rules of Criminal Procedure as amended effective December 15, 1977, in particular the amendment goes to Rule 10.1(B) under procedure where the Supreme Court of Arizona amended that rule at the request of the Superior Court of Maricopa County wherein the words: 'Except for the commencement of a hearing of trial,' were inserted.

"The events which gave rise to the request for the amendment and the Supreme Court's adoption of the amendment was precisely as this Court is presented with here today. The amendment also added the last sentence of subparagraph B, quote, Allegations of interest or prejudice which prevent a fair and impartial hearing or trial may be preserved for appeal.

"The obvious intent of the Supreme Court and our intent in requesting the changed amendment to the rule was to avoid delays of trial by the filing of such documents during trial.

"I have determined that it is my responsibility to make the decision to proceed with this trial and it is so ordered.

"The defense may proceed.

"MR. FELDHACKER: Your Honor, on behalf of Mr. Cruz, I don't believe you have jurisdiction to proceed with the trial and Mr. Cruz and I no longer intend to participate in the trial.

"THE COURT:

\* \* \* \* \* \*

"The Court rejects your statement that you do not intend to proceed. You will, as an officer of this Court, proceed to represent your client and present his case or failing which I will assume that you do not intend to offer any evidence in behalf of your client; is that my correct assumption?

"MR. FELDHACKER: (No response.)

"THE COURT: Counsel.

"MR. FELDHACKER: I have no further record to make, your honor.

"THE COURT: Very well.

"You may proceed with the presentation of defendant McCall's defense."

The trial court went on to state:

"THE COURT: Well, I have already ruled on what I believe to be a correct interpretation of the law, that under Rule 10.1, the defendant had an absolute right to file a Notice of Change of Judge for Cause and his record is preserved for review on appeal at a later time.

"That is why the rule was amended, so that proceedings of this sort would not be, get bogged down in internal delays on collateral issues.

"I am positively certain I'm correct in that regard. I am proceeding with jurisdiction, not without jurisdiction.

"Had such a motion been filed prior to this trial commencing, it would be jurisdictional and it would be necessary that this matter be assigned to the Presiding Judge for hearing either by the Presiding Judge or some other assigned Judge."

For the rest of that day and the next day appellant's counsel refused to participate in the trial. He did not call any more witnesses on appellant's behalf and did not cross-examine those witnesses called by McCall. At the end of the second day the trial court granted a continuance to allow the defense to investigate certain matters. The request for a continuance was made by McCall with appellant, through his counsel, joining in. When the trial recommenced several days later appellant's counsel resumed active participation.

Based on the record before us it appears that trial counsel's conduct was indefensible. It is clear from the most superficial reading of Rule 10.1 that a motion for change of judge for cause need not be referred to a different judge for a hearing unless filed prior to the commencement of a hearing or trial. It is equally clear that counsel did not have to refuse to participate in the trial in order to preserve the issue for appeal. The rule plainly provides that "[a]llegations of interest or prejudice which prevent a fair and impartial hearing or trial may be preserved for appeal." Further-

more, the above-quoted passage from the trial transcript demonstrates that the trial judge made it abundantly clear to appellant's counsel that the claim of prejudice was preserved for appeal. Counsel's attempt to justify his conduct by citing cases decided under Rule 10.1 before its amendment in 1977 is, to put it kindly, weak.

■ As a result of the trial counsel's conduct the trial judge was presented with a difficult dilemma. He should not, however, have allowed the trial to continue with appellant's counsel refusing to participate. In a case where counsel refuses to participate, even after it is made clear that the claim of prejudice is preserved for appeal, the court should order counsel to proceed, on pain of contempt, fine and/or bearing the cost of a mistrial. If this succeeds in changing counsel's mind the Court must then closely monitor counsel's coerced participation for its effectiveness. If counsel still refuses to participate, or if counsel's participation is not effective or not in good faith then the judge should declare a mistrial, hold counsel in contempt, and report the case to the State Bar of Arizona. We believe this approach will best ensure that a criminal defendant's right to counsel is not compromised, while at the same time deterring unscrupulous counsel from creating error to secure a mistrial or reversal on appeal.

For the foregoing reasons, the judgments of conviction and sentences are reversed and the case is remanded for a new trial.

HOLOHAN, C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.