NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

VICTOR PIERRE BENTO SILVA, *Appellant.*

No. 1 CA-CR 16-0183
FILED 3-21-2017

Appeal from the Superior Court in La Paz County
No. S1500CR201500062
The Honorable Samuel E. Vederman, Judge

**AFFIRMED IN PART; MODIFIED IN PART; REMANDED IN PART**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

David Goldberg Attorney at Law, Fort Collins
By David Goldberg
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge James P. Beene delivered the decision of the Court, in which
Presiding Judge Diane M. Johnsen and Judge Margaret H. Downie joined.

**B E E N E**, Judge:

**¶1**　　　　Victor Pierre Bento Silva appeals his convictions and
sentences for first-degree murder, unlawful flight from law enforcement,
conspiracy to commit drive-by shooting, and theft.  For the reasons that
follow, we affirm in part, modify in part, and remand for resentencing.

## BACKGROUND[1]

**¶2**　　　　On February 16, 2015, Fairfax, California police officers
responded to a reported home invasion.  Among other items, the residents
reported five weapons that had been stolen, including a rifle and a
handgun.

**¶3**　　　　Acting on a tip, police officers then searched Stephanie Hill's
storage locker and recovered other items that had been reported stolen.
They also learned that Silva was associated with the locker and found
several documents bearing his name.

**¶4**　　　　A week after the burglary, two Novato, California police
officers conducted a traffic stop of a car Hill was driving.  Seeing a rifle on
the floorboard of the car, the officers drew their weapons and ordered Hill
and passenger Silva to show their hands.  Refusing to comply, Hill engaged
in a physical altercation with one of the officers through the driver's-side
window.  Eventually, after Hill was able to break free from the police
officer, the vehicle fled the scene.  The officers immediately attempted
pursuit, but were unable to locate the vehicle.  They then requested and
obtained an arrest warrant for Hill for evading and resisting arrest.

**¶5**　　　　Five days later, Riverside County deputies responded to an
interagency request to locate two "armed and dangerous" suspects driving
a 2015 black Chevy Tahoe. Using coordinates from a cellular phone

---

[1]　　　We view the facts in the light most favorable to sustaining the
verdicts.  *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

believed to be inside the vehicle, deputies located the Tahoe in Coachella and attempted to initiate a felony stop. At first, the driver, Silva, followed the deputies' commands to place his left hand outside the driver's-side window. Moments later, however, Silva retracted his hand and the Tahoe sped away.

¶6 A chase ensued, with numerous law enforcement vehicles following the Tahoe onto Interstate 10 heading eastbound toward the Arizona border. During the course of the pursuit, the Tahoe traveled at speeds in excess of 130 miles per hour and the passenger, Hill, repeatedly shot at civilian vehicles.

¶7 As the Tahoe crossed the border into Arizona, it ran over spike strips laid across the roadway by law enforcement, spun, and careened off the interstate. Once the Tahoe stopped, Silva and Hill emerged from the vehicle and began running across the Arizona desert. Initially, Silva ran ahead and then waited for Hill to catch up, but eventually the subjects separated and ran off in different directions. Silva eventually stopped and complied with officers' commands to place his hands in the air. As Silva surrendered, officers who had pursued Hill saw her reach into her pocket and partially remove a black handgun. An officer shot Hill repeatedly and she fell to the ground. Silva was taken into custody and Hill was declared dead at the scene.

¶8 Following his arrest, Silva admitted stealing at least $10,000 as part of a California burglary. He also admitted that he and Hill had devised a strategy for evading police officers during the chase that ended in his arrest, and agreed to shoot at civilian vehicles in an effort to cause flat tires, disable vehicles, and thereby block pursuing officers.

¶9 The State charged Silva with one count of first-degree felony murder (underlying felony – unlawful flight), and one count of unlawful flight. Under a different cause number, the State later charged Silva with four counts of conspiracy, three counts of theft, two counts of misconduct involving weapons, and three drug offenses. Upon the State's request, the two cases were joined. The State subsequently moved to dismiss one count of conspiracy and both counts of misconduct involving weapons, which the superior court granted. The court also granted Silva's motion to sever the drug charges, leaving only the felony murder, unlawful flight, conspiracy (three counts) and theft (three counts) charges for trial.

¶10 At trial, the State presented evidence of various stolen items that were seized from the Tahoe, including jewelry and a rifle. An officer also testified that $5,500 was found on the ground near Hill's body.

¶11 Taking the witness stand in his own defense, Silva testified that he primarily acted under duress during the chase. Although he acknowledged that he did not say so during his police interview, Silva testified that Hill, his wife, had threatened to shoot him if he complied with police officers during the Coachella felony stop, and held him at gunpoint the entire drive from Coachella to the Arizona border. When asked about the plan he and Hill had devised to shoot at civilian vehicles, Silva stated that Hill initially wanted to shoot people, and he had convinced her to aim only for tires. He also claimed that "at least" $5,000 of the cash found next to Hill was his, although he admitted that Hill had counted at least $10,000 in cash stolen from a home invasion.

¶12 After an eleven-day trial, the jury found Silva guilty of first-degree felony murder, unlawful flight, two counts of conspiracy (conspiracy to hinder prosecution and conspiracy to commit drive-by shooting), and theft in the amount of $25,000 or more. At sentencing, the superior court merged the two conspiracy counts, finding that there was "only one conspiracy." The court then sentenced Silva to a mitigated term of four and one-half years' imprisonment for theft, a consecutive, mitigated term of four and one-half years' imprisonment for conspiracy to commit drive-by shooting, a consecutive, mitigated term of one year imprisonment for unlawful flight from law enforcement, and a term of life imprisonment for the count of first-degree murder, to be served concurrent to the term for unlawful flight. Silva timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2003), 13-4031, and -4033(A)(1) (2010).

## DISCUSSION

### I. Jurisdiction

¶13 Silva contends the superior court lacked jurisdiction to try him on the charges of theft and conspiracy to commit drive-by shooting because the alleged conduct occurred in California. Accordingly, he argues the superior court erred by denying his motion to dismiss those charges for lack of jurisdiction.

¶14 Subject matter jurisdiction is a question of law that we review *de novo*. *State v. Flores*, 218 Ariz. 407, 410, ¶ 6 (App. 2008). Pursuant to A.R.S.

§ 13-108 (2010), Arizona has jurisdiction over "an offense that a person commits by his own conduct or the conduct of another" if, as relevant here:

1. Conduct constituting any element of the offense or a result of such conduct occurs within this state; or

2. The conduct outside this state constitutes an attempt or conspiracy to commit an offense within this state and an act in furtherance of the attempt or conspiracy occurs within this state[.]

¶15        Addressing the theft charge first, the State alleged that Silva knowingly controlled property that he knew or had reason to know belonged to someone else, and that he exerted the element of control within Arizona, having transported the stolen property across the state line.  *See* A.R.S. § 13-1802(A)(5) (Supp. 2016).  Because Silva was charged with committing conduct within the State that constituted an element of theft, the superior court properly exercised jurisdiction over the charge pursuant to A.R.S. § 13-108(1).  *See also* Ariz. Const. art. 6, § 14(4) (stating superior courts have jurisdiction over "[c]riminal cases amounting to felony").

¶16        Turning to the drive-by shooting conspiracy charge, a person conspires if, acting with the intent to promote or aid the commission of an offense, such person agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense and one of the parties commits an overt act in furtherance of the offense, except that an overt act shall not be required if the object of the conspiracy was to commit any felony upon another person. A.R.S. § 13-1003(A) (2010).  As set forth in A.R.S. § 13-1209(A)(2) (2010), a person commits drive-by shooting by intentionally discharging a weapon from a motor vehicle at a person, another occupied motor vehicle or an occupied structure.  Reading the statutes together, the elements of conspiracy to commit drive-by shooting are: (1) an intent by the defendant to promote or assist the commission of drive-by shooting, and (2) an agreement between the defendant and another person that one of them or another person will intentionally discharge a weapon from a vehicle at a person or an occupied vehicle or structure.

¶17        Based on Silva's statements to police, the State alleged that Silva and Hill agreed that Hill would shoot at the tires of other vehicles in an attempt to disable those vehicles so they would block pursuing officers. Meanwhile, Silva, in furtherance of their overall objective to elude law enforcement, would drive the Tahoe at a high rate of speed to outpace the

chasing police cars. Although the State concedes that Silva and Hill did not shoot at any vehicles in Arizona, there is no evidence that Silva and Hill took any affirmative measures to end their agreement before their vehicle came to a stop. To the contrary, all evidence reflects that the object of their conspiracy, namely, to evade capture, continued into Arizona, and thus there is no basis to conclude the conspiracy to commit drive-by shooting ended before Silva and Hill crossed into Arizona. *See State v. Cruz*, 137 Ariz. 541, 547 (1983) (explaining a "conspiracy may continue after the commission of the substantive offense" when the "object of the conspiracy includes more than the commission of a substantive offense"); *see also State v. Gaydas*, 159 Ariz. 277, 279 (App. 1988) ("A conspiracy generally ends once its criminal objective is attained."). Moreover, although no overt act was necessary to prove a conspiracy under A.R.S. § 13-1003(A), Silva's continued high-speed driving into Arizona and Hill's continued possession of a weapon qualified as acts in furtherance of the conspiracy sufficient to extend jurisdiction under A.R.S. § 13-108(A)(1). Therefore, the superior court properly exercised jurisdiction over the drive-by shooting conspiracy charge.[2]

## II.     Alleged Prosecutorial Vindictiveness

¶18      Silva contends the State acted with vindictiveness by bringing a second indictment containing additional charges, and the superior court therefore improperly denied his motion to dismiss on that basis.

¶19      We review a superior court's disposition of a claim of prosecutorial vindictiveness for an abuse of discretion. *State v. Brun*, 190 Ariz. 505, 506 (App. 1997). A prosecutor's decision to file new charges is vindictive if made in retaliation for the defendant's exercise of a constitutional or statutory right. *Id.*

¶20      "A defendant may such demonstrate prosecutorial vindictiveness by proving objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do." *State v. Tsosie*, 171 Ariz. 683, 685 (App. 1992) (internal quotation omitted). "Because actual vindictiveness is difficult to prove, a defendant in some circumstances may rely on a

---

[2]      To the extent Silva also argues the superior court lacked jurisdiction because the State failed to prove that he transported stolen property with a value of $25,000 or greater into Arizona, this claim is not properly framed as a matter of jurisdiction, but one of sufficiency of the evidence, which we address *infra*, ¶¶ 45-46.

presumption of vindictiveness." *Brun*, 190 Ariz. at 506 (internal quotation omitted). A presumption of vindictiveness may lie in a pretrial setting, but its application at that stage of the proceedings is disfavored because "[i]n the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance." *United States v. Goodwin*, 457 U.S. 368, 381 (1982). Therefore, to warrant a presumption of vindictiveness in the pretrial setting, the defendant must set forth "additional facts" that, combined with the sequence of events, justify the presumption. *Brun*, 190 Ariz. at 507. "If a defendant makes a *prima facie* showing that the charging decision is more 'likely than not attributable to vindictiveness' by the prosecutor, the burden shifts to the prosecutor to overcome the presumption 'by objective evidence justifying the prosecutor's action.'" *State v. Mieg*, 225 Ariz. 445, 448, ¶ 12 (App. 2010) (citations omitted).

**¶21** In the initial indictment, filed March 4, 2015, the State charged Silva with one count of first-degree felony murder and one count of unlawful flight from law enforcement. At the April 13, 2015 pretrial conference, Silva requested that a firm trial date be set. The State did not object, but advised the court that new charges were "pending[.]" The court then set a trial date of July 28, 2015.

**¶22** On May 26, 2015, the initial prosecutor assigned to the case moved to have the matter designated a complex case.[3] On June 9, 2015, the State filed a complaint in CR 2015-00169 charging Silva with thirteen additional counts. The next day, the superior court issued a written order for a complex case designation and set a new trial date of December 4, 2015, based on the complex case designation. On the same day, the succeeding prosecutor presented Silva with a plea agreement. At the June 29, 2015 pretrial conference, Silva rejected the State's plea offer.

**¶23** On July 1, 2015, the State filed an indictment in CR 2015-00169 charging Silva with the thirteen additional counts alleged in the June 9, 2015 complaint. Also on July 1, 2015, the State moved to join CR 2015-00062 and CR 2015-00169, which the superior court granted. At the subsequent *Donald*[4] hearing, Silva rejected an offer by the State to allow him to plead

---

[3]     Once designated a "complex case," an individual shall be tried 270 days from arraignment. Ariz. R. Crim. P. 8.2(a)(3).

[4]     *State v. Donald*, 198 Ariz. 406, 418, ¶ 46 (App. 2000).

guilty to second-degree murder with a sentence no greater than the presumptive term of sixteen years, and a dismissal of all other charges.

¶24        Over four months later, Silva moved to dismiss on the basis of vindictive prosecution. At the hearing on the motion, the prosecutor noted that the previous prosecutor filed the additional charges "around the same time" as he moved to designate the case complex. When asked about the delay in filing a second indictment, the prosecutor explained that after the case was reassigned to her, it took some time for her to sort and process all of the information and make "appropriate charging and offer decisions." After hearing from the parties, the superior court found that Silva had set forth a "*prima facie* case" of vindictiveness, but concluded the prosecutor rebutted the presumption because the delay could be attributed to "disorganization, incompetence, [and] ignorance."

¶25        Notwithstanding the superior court's finding, the record reflects that Silva failed to set forth sufficient facts that, together with the sequence of events, warranted a presumption of vindictiveness. To the extent Silva argues the State filed additional charges in retaliation for his exercise of the right to a speedy trial, the record reflects that the complex case designation, not the filing of additional charges, extended the last day for trial. Likewise, to the extent Silva argues the State brought additional charges because he rejected the State's plea offer, it is undisputed that the prosecutor informed the court that additional charges were pending when Silva requested a firm trial date in April 2015, and that such charges were alleged in the complaint filed on June 9, 2015, events predating the State's plea offer.

¶26        Nonetheless, even if Silva established a *prima facie* case of vindictiveness, as found by the superior court, the State rebutted the presumption. The record reflects that the prosecutor was not assigned to the case until late May, and she avowed that it took her a substantial period of time to review the case and thoroughly assess the appropriate charges. The superior court was in the best position to evaluate the prosecutor's credibility, and concluded the delay was not attributable to "bad faith or maliciousness." *See State v. Canez*, 202 Ariz. 133, 147, ¶ 28 (2002) ("We give great deference to the trial court's ruling, based, as it is, largely upon an assessment of the prosecutor's credibility."), *abrogated on other grounds by State v. Valenzuela*, 239 Ariz. 299 (2016). Therefore, the superior court did not abuse its discretion by denying Silva's motion to dismiss the charges. *See State v. Perez*, 141 Ariz. 459, 464 (1984) (explaining that appellate courts have the obligation "to affirm the trial court's ruling if the result was legally correct for any reason").

### III.    Denial of Motion for Mistrial

**¶27**        Silva argues the superior court erred by denying his motion for mistrial. Specifically, he asserts the superior court should have declared a mistrial after a witness referred to evidence that had been precluded by a previous court order.

**¶28**        We review the denial of a motion for mistrial for an abuse of discretion. *State v. Jones*, 197 Ariz. 290, 304, ¶ 32 (2000). In evaluating whether a mistrial is warranted under these circumstances, the superior court "is in the best position to determine whether the evidence will actually affect the outcome of the trial." *Id*. To make this determination, the superior court should consider "(1) whether the remarks called to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) the probability that the jurors, under the circumstances of the particular case, were influenced by the remarks." *State v. Hallman*, 137 Ariz. 31, 37 (1983). Because "a declaration of a mistrial is the most dramatic remedy for trial error," it should be granted "only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson*, 136 Ariz. 250, 262 (1983).

**¶29**        Prior to trial, the superior court granted Silva's motion to preclude all evidence pertaining to the murder of one of the California home invasion victims, concluding the probative value was substantially outweighed by the danger of unfair prejudice. On the second day of trial, however, a trooper with the Arizona Department of Public Safety testified that he received a call on February 28, 2015 alerting him that California law enforcement personnel "were chasing two homicide suspects and they were approaching the Arizona border." Silva immediately raised an objection, which the superior court sustained. Silva then moved for a mistrial, arguing testimony of that nature had been expressly precluded by court order. After the prosecutor avowed that she had instructed all of the State's witnesses, both orally and in writing, not to reference the homicide allegations, the superior court denied the motion for mistrial, but struck the trooper's answer and instructed the jury not to consider it.

**¶30**        Given the broad scope of the superior court's preclusion ruling, the trooper's statement was clearly inadmissible. The court sustained the defense objection, however, and struck the testimony and instructed the jury to disregard the answer, which minimized the possibility that the fleeting and isolated reference to precluded evidence may have influenced the jury's verdicts. *See State v. Miller*, 234 Ariz. 31, 40,

¶ 25 (2013) ("[W]hen a witness unexpectedly volunteers an inadmissible statement, the action called for rests largely within the discretion of the trial court . . . [to] decide if some remedy short of mistrial will cure the error."). Because we presume a jury follows instructions, and Silva has not presented any evidence to overcome that presumption, the statement, though improper, was harmless. *See State v. Goudeau*, 239 Ariz. 421, 469, ¶ 214 (2016). Therefore, the superior court did not abuse its discretion by denying Silva's motion for mistrial.

## IV. Jury Instructions

**¶31** Silva challenges the superior court's final instruction to the jury on causation. He contends that the instruction failed to accurately state the law and further argues the superior court erroneously denied his requested "timing" instruction.

**¶32** At trial, both the State and the defense requested a jury instruction regarding the "timing" of felony murder. The State requested this instruction:

> When the underlying felony is so entwined with the homicide that it is part of that homicide, it is not appropriate to hold a stopwatch on the events or artificially break down the actions of the defendant into separate components.

> There is no requirement that the homicide occur while committing or while engaged in the unlawful flight from pursuing law enforcement, or that the homicide be a part of the unlawful flight from pursuing law enforcement, other than that the few acts be a part of one continuous transaction. Thus the homicide need not have been committed to perpetrate the unlawful flight from pursuing law enforcement.

> There need be no technical inquiry as to whether there has been a completion or abandonment of or desistence from the unlawful flight from pursuing law enforcement before the homicide itself was completed.

Silva requested this instruction:

> The accused cannot be convicted of murder in the first degree unless the death and the unlawful flight were part of one continuous transaction. If you find that the crime of unlawful

flight was completed or terminated prior to an act which caused the death of another, then you cannot find the defendant guilty of first degree murder.

¶33 During the settling of the final jury instructions, Silva objected to the omission of his requested instruction. The superior court responded that the court's proposed instructions adequately stated the law. When the State subsequently objected to the omission of its requested "timing" instruction, the court again stated that the instructions, as written, adequately addressed the timing concerns, and Silva volunteered that the State's offered instruction, "probably much like the instruction [the defense] offered, probably constitutes a comment on the evidence." The State further objected to the superior court's proposed instructions that stated the jury could find Silva guilty of felony murder only if he proximately caused Hill's death. Overruling the State's objection, the court provided the jury the following causation instruction:

Conduct is the cause of a result when both of the following exist:

One, but for the conduct the result in question would not have occurred.

Two, the relationship between the conduct and the result satisfies any additional causal requirements imposed by the definition of the offense.

In order to find the defendant guilty of first degree felony murder, you must find that the death was proximately caused by the acts of the defendant.

The proximate cause of the death is the cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred.

Proximate cause does not exist if the chain of natural effects and cause either does not exist or is broken by a superseding event that was unforeseeable by the defendant and, with the benefit of hindsight, may be described as abnormal or extraordinary.

The State must prove beyond a reasonable doubt that a superseding intervening event did not cause the death.

Causal – Causation, multiple actors. The unlawful acts of two or more people may combine to cause the death of another. If the unlawful act of the – the other person was the sole proximate cause of death, you must find the defendant not guilty.

¶34        Before closing arguments, however, the superior court invited the prosecutor to further explain why the causation instruction should be modified. The prosecutor again argued that the given instruction improperly limited causation to Silva's acts, in contravention of the law. After closing arguments, the court told the jurors to disregard the initial causation instruction. It then reread the instruction to the jury, in its entirety, incorporating the following modification: "In order to find the defendant guilty of first degree felony murder, you must find that the death was proximately caused by the acts of the defendant or another person."

¶35        We review a superior court's decision to grant or deny a requested jury instruction for an abuse of discretion, *State v. Hurley*, 197 Ariz. 400, 402, ¶ 9 (App. 2000), but review *de novo* whether instructions accurately state the law. *State v. Fierro*, 220 Ariz. 337, 338, ¶ 4 (App. 2008). To assess whether instructions properly reflect the law, we review them in their entirety and will not reverse a jury verdict based on an erroneous instruction unless the instructions, taken as a whole, could reasonably mislead a jury. *State v. Hoskins*, 199 Ariz. 127, 145, ¶ 75 (2000); *State v. Gallegos*, 178 Ariz. 1, 10 (1994). If a jury instruction is substantially free from error, it generally will not prejudice the defendant. *Gallegos*, 178 Ariz. at 10.

¶36        Read together and as relevant here, A.R.S. §§ 13-1105(A)(2) (2010) (felony murder) and 28-622.01 (2012) (unlawful flight) provide that a person commits felony murder, whether acting "alone or with one or more other persons," by driving a motor vehicle to "willfully flee[] or attempt[] to elude a pursuing law enforcement vehicle," and "in the course of and in furtherance of th[at] offense or immediate flight from th[at] offense, the person or another person causes the death of any person."

¶37        Applying these statutes to the facts in this case, in which the underlying felony of unlawful flight ended when Silva and Hill exited the vehicle, the narrow question before the jury was whether Silva or another person caused Hill's death during their subsequent immediate flight. Viewed in their entirety, the superior court's instructions, which identified all the elements of felony murder and unlawful flight, and included a causation instruction that tracked A.R.S. § 13-1105(A)(2), adequately reflected the law. *See State v. Prasertphong*, 206 Ariz. 70, 90, ¶ 81 (2003) ("We

have encouraged trial courts to closely follow statutory language when instructing on felony murder."), *vacated on other grounds by*, 541 U.S. 1039 (2004); *see also State v. Mott*, 187 Ariz. 536, 546 (1997) (explaining a trial court need not provide a proximate cause instruction when the given instructions "instruct the jury on the elements of the crime, including causation," and, in their entirely, adequately reflect the law).

¶38　　　Silva's proposed instruction, on the other hand, stated that Silva was not culpable for Hill's death if the underlying felony of unlawful flight terminated before she was shot, which is in contravention of the immediate flight provision of A.R.S. § 13-1105(A)(2).　Furthermore, the given instructions did not preclude Silva from arguing that he had surrendered before Hill sustained her fatal injuries.　Indeed, defense counsel argued that theory extensively to the jury during closing argument. To the extent Silva also contends that the instructions misstated the law on proximate causation and informed the jurors that he was legally responsible for Hill's death even if her conduct was an intervening cause, the superior court provided the jury with a superseding cause instruction that correctly stated Silva was not culpable for felony murder if an unforeseeable event caused Hill's death.　Therefore, the superior court did not err by providing the given causation instruction or abuse its discretion by denying Silva's special timing instruction.

## V.　　Denial of Motion for a Judgment of Acquittal

¶39　　　Silva contends the superior court erred by denying his motion for a judgment of acquittal for the counts of felony murder and miscellaneous theft.

¶40　　　Following the State's presentation of evidence, Silva moved for a judgment of acquittal pursuant to Arizona Rules of Criminal Procedure 20, which the superior court denied.　We review *de novo* a ruling on a Rule 20 motion.　*State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011).　"[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."　*Id*. at ¶ 16 (internal quotation omitted).　Sufficient evidence upon which a reasonable jury can convict may be direct or circumstantial.　*State v. Borquez*, 232 Ariz. 484, 487, ¶ 11 (App. 2013).　A judgment of acquittal is appropriate only when "there is no substantial evidence to warrant a conviction."　Ariz. R. Crim. P. 20(a).

¶41        As charged in this case, a person commits felony murder when, "[a]cting either alone or with one or more other persons," he commits or attempts to commit unlawful flight from a pursuing law enforcement vehicle and, "in the course of and in furtherance of the offense or immediate flight from the offense, the person or another person causes the death of any person."   A.R.S. § 13-1105.   "Whether a death occurred during 'immediate flight' from the underlying offense is [] a fact question." *State v. Lucero*, 204 Ariz. 363, 365, ¶ 13 (App. 2003).

¶42        Silva does not contest that the State presented sufficient evidence that he, acting with Hill, committed unlawful flight.   Rather, he challenges only the sufficiency of the evidence that Hill was shot during his immediate flight from the underlying felony and that he caused her death.

¶43        At trial, numerous witnesses testified regarding Silva's location and conduct at the time of Hill's shooting.   All the witnesses agreed that Silva's surrender to police and the shooting occurred nearly simultaneously, but some officers testified that at the moment Hill was shot, Silva had his hands in the air, others testified that he had placed his hands up and dropped to his knees, one officer testified that Silva was handcuffed, and another testified that he was prone on the ground.   The officer who shot Hill testified that he saw Silva on his knees with his hands in the air immediately before the officer discharged his firearm in Hill's direction, and Silva testified that he heard shots seconds after he had surrendered to police.   The custodian of records for the Riverside County Sheriff's Department testified that the dispatch log for that day showed the shots were logged sixteen seconds after an officer reported that Silva had placed his hands in the air.

¶44        Although Silva had stopped running by the time Hill was shot, the State also presented evidence that he nonetheless remained a threat to officer safety because suspects sometimes comply with officer commands as a "ruse" in order to lure officers into a more dangerous position, and deputies did not know at the time whether Silva was armed. In light of this testimony, as well as the differing accounts regarding the degree to which Silva had been subdued at the time of the shooting, there was some evidence from which a reasonable jury could conclude that Silva continued to present an imminent risk and his immediate flight did not end until he no longer posed a threat to officer safety, which, by numerous accounts, did not occur until after Hill was shot. *See State v. Hitchcock*, 87 Ariz. 277, 280 (1960) (rejecting the defendant's claim of insufficient evidence to support his felony murder conviction, explaining "the events which transpired immediately preceding the shooting occurred in rapid sequence

and as a part of the chain of events which defendant's deliberate acts had set in motion" and it was unclear to what extent the defendant had been "subdued" at the time of the shooting).

**¶45**      Furthermore, to the extent Silva contends the State failed to present evidence that he caused Hill's death, the record is replete with uncontroverted evidence that Hill would not have been shot absent Silva and Hill's unlawful flight from the California felony stop and immediate flight therefrom. *See State v. Bennett*, 213 Ariz. 562, 567, ¶ 23 (2006) (explaining the causation requirement for felony murder is satisfied when "the death would not have happened without the [predicate felony offense]"). Although Silva argues Hill's attempt to draw her weapon when faced with advancing police officers was "unforeseeable" and broke the chain of events for which he is culpable, there was evidence to support the contrary. The record reflects that Hill repeatedly shot at civilian vehicles during the police pursuit and, therefore, her subsequent attempt to brandish the weapon and prevent capture may not reasonably be characterized as abnormal or extraordinary. For these reasons, the superior court did not err by denying Silva's Rule 20 motion with respect to felony murder.

**¶46**      Turning to the conviction for theft, Silva argues only that the State failed to prove that the value of the stolen property seized from the scene was $25,000 or greater as required to sustain his conviction of a class two felony under A.R.S. § 13-1802(G). The State concedes that insufficient evidence supports the conviction.

**¶47**      At trial, an officer testified that $5,500 was found on the ground near Hill's body. The State also presented evidence that various other stolen items were seized from the Tahoe, including jewelry and collectible coins, but presented no evidence regarding the value of those items. During his testimony, Silva claimed that $5,000 of the money recovered from the scene belonged to him, but he also admitted during his police interview that Hill had counted at least $10,000 stolen from a home invasion. Given these facts, and absent any evidence regarding the value of the jewelry or coins, there was sufficient evidence from which a reasonable jury could find that Silva knowingly controlled property that he knew or had reason to know was stolen, but only in an amount greater than $4,000 and less than $25,000, a class three felony. A.R.S. § 13-1802(A)(5), (G). Therefore, we modify the judgment to reflect Silva's conviction for the necessarily included lesser offense of theft, a class three felony, and remand to the superior court for resentencing. Ariz. R. Crim. P. 31.17(d).

## VI.     Alleged Juror Coercion

¶48          Silva contends the superior court improperly denied his motion for new trial and his motion to vacate the judgment, which were predicated on his claim that the court, through its response to a jury question, coerced the guilty verdicts.

### a.  Denial of Motion for New Trial

¶49          Before excusing the jury to deliberate in the late afternoon on the tenth day of trial, the superior court instructed the jurors to set their own deliberation schedule, explaining the jurors were "in charge" of their schedule, but it was nonetheless subject to court approval.  Approximately forty-five minutes later, the jury submitted its proposed schedule and the superior court, after clarifying the dates and times, set the schedule for the jury to resume deliberations at 1:00 p.m. on December 21, permitting the jurors to "stay late" if necessary, and then, if the jurors were unable to reach a verdict on December 21, continue deliberations on December 30.

¶50          When the jurors resumed deliberations at 1:25 p.m. on December 21, the superior court informed them that they could stay only until 6:00 p.m., and would need to return on December 30 if a verdict was not reached by that time.  At 4:08 p.m., the jury submitted the following question: "If we find guilt or innocence on four counts, and we are unable to reach unanimity on three remaining charges, what happens?"  The prosecutor requested that the court "inquire of the jury in more detail" whether they were "absolutely certain they w[ould] never come to an agreement on those other counts or whether they, with more deliberation, could come [to an agreement]."  The judge responded, "I don't take it that way," and explained he interpreted the question as a "legal issue," with the jurors wanting to know "what happens ultimately" to counts for which no verdict is reached.  Interpreting the question in the same manner as the prosecutor, defense counsel stated that "Rule 22.4 applies" because the jurors had effectively advised the court that they had reached an impasse in deliberations.  The judge again stated that he believed the jurors were simply "trying to find out what happens to the three charges if they can't agree on them."  The judge then suggested responding as follows:

> The question being asked is beyond the scope of the role of the jury.  Please continue to deliberate.  Please let the Court know if there is anything that would assist you with your deliberations.

When directly asked, both the prosecutor and defense counsel stated they had no objection to that response.

**¶51**         At 5:54 p.m. that evening, the jury returned its verdicts, finding Silva guilty on five counts and not guilty on two counts. After reading the verdicts, the superior court instructed the clerk to poll the jurors, and each juror expressly affirmed that the verdicts as read were the true and correct verdicts for all charges.

**¶52**         Ten days later, Silva filed a motion for new trial, arguing the superior court committed fundamental error by improperly responding to the jurors' question. At the hearing on the motion, the defense argued that the deliberation schedule, which required the jury to resume deliberations on "New Year's Eve"[5] if they did not reach a verdict, was coercive. In addition, the defense argued that the jurors' question "clear[ly] reflected that they were deadlocked," and therefore, Rule 22.4 was triggered, requiring the court to inquire whether they were indeed at an impasse. After further argument, the superior court denied the motion for new trial.

**¶53**         We generally review the denial of a motion for new trial for an abuse of discretion. *State v. West*, 238 Ariz. 482, 488, ¶ 12 (App. 2015). To determine whether the superior court coerced a jury's verdict, we consider "the actions of the judge and the comments made to the jury based on the totality of the circumstances[,]" and evaluate whether "the independent judgment of the jury was displaced." *State v. Huerstel*, 206 Ariz. 93, 97, ¶ 5 (2003). "What conduct amounts to coercion is particularly dependent upon the facts of each case." *State v. Roberts*, 131 Ariz. 513, 515 (1982).

**¶54**         In evaluating whether the superior court's actions or statements were coercive, we consider whether the jury had indicated it was deadlocked or had stated that additional deliberations would not be helpful, the court's knowledge of a numerical split among the jurors, the identification of a holdout juror, and the presence or absence of a cautionary instruction. *See State v. McCrimmon*, 187 Ariz. 169, 172-73 (1996); *State v. Lautzenheiser*, 180 Ariz. 7, 9-10 (1994); *State v. McCutcheon* (*McCutcheon II*), 162 Ariz. 54, 60 (1989); *State v. McCutcheon* (*McCutcheon I*), 150 Ariz. 317, 320 (1986); *Roberts*, 131 Ariz. at 514-16; *State v. Sabala*, 189 Ariz. 416, 420 (App. 1997). Here, the jury's question to the court did not: (1) clearly state that the jurors were deadlocked or otherwise suggest that additional deliberations

---

[5]         The jury was actually scheduled to resume deliberations on December 30, 2015, if necessary.

would be futile, (2) provide a numerical split among the jurors, or (3) identify a holdout juror. Likewise, the superior court's response to the jurors did not inquire regarding a numerical split or question the identity of any possible holdouts, and offered furthered assistance if desired.

**¶55**       Citing *State v. Andriano*, 215 Ariz. 497 (2007), Silva argues the superior court erred by failing to instruct the jurors that a deadlocked jury was acceptable and further admonishing them not to surrender their firmly held beliefs. Similar to the jury question posed in this case, the jurors in *Andriano* asked the trial court: "If we are unable to reach an unanimous verdict, what is the procedure that will be followed?" *Id*. at 508, ¶ 54. The trial court responded with an impasse instruction. *Id*. In affirming Andriano's conviction and sentence, the supreme court held that the jury's question was an "affirmative indication" that it was deadlocked and the trial court did not err by giving the impasse instruction. *Id*. at 509, ¶ 56.

**¶56**       Applying *Andriano* to this case, the superior court would have acted within its considerable discretion had it provided the jury an impasse instruction. Contrary to Silva's argument, however, *Andriano* does not stand for the proposition that a court errs by failing to provide an impasse instruction when the jury submits a question indicating a possible impasse. Indeed, our supreme court has held that simply asking jurors to continue to deliberate, as the superior court did in this case, is not coercive because it "neither asks the jury to reach a verdict nor suggests that any juror should change his or her views." *State v. Cruz*, 218 Ariz. 149, 167, ¶ 115 (2008). In *Cruz*, the jury submitted a question that read: "If one person's decision remains unchanged against the other 11 jurors is this a hung jury? If so what happens next?" *Id*. at 166-67, ¶ 108. Reasoning that the question "was hypothetical," the trial court responded: "[a]t this time I would ask you to continue your deliberations to attempt to resolve any differences." *Id*. The supreme court concluded that the court's response was not coercive, whether the jurors were posing a hypothetical question or had actually become deadlocked. *Id*. at 167, ¶ 115.

**¶57**       Finally, to the extent Silva contends the jury's deliberation schedule was itself coercive, we note that the jurors determined their own schedule and there is no basis on this record to conclude that the jurors felt pressured to reach their verdicts within a limited time frame. Therefore, considering the totality of the circumstances, the superior court's response to the jury question was not coercive and the court did not abuse its discretion by denying Silva's motion for new trial.

### b. Denial of Motion to Vacate Judgment

**¶58**        After sentencing, Silva filed a motion to vacate the judgment pursuant to Rule 24.2 on grounds of newly discovered evidence. Specifically, Silva presented the affidavit of a juror who averred that she held a different position than the other jurors during deliberations and the superior court's response to the jury question made her believe she had to vote guilty. At the hearing on the motion, Silva asked the superior court to hold an evidentiary hearing to allow the parties to question each of the twelve jurors regarding the impact of the court's response to the jury question. After taking the matter under advisement, the superior court denied Silva's request for an evidentiary hearing and the motion to vacate, concluding Silva had not presented newly discovered material facts and the juror's affidavit lacked credibility because each juror had individually affirmed the unanimous verdicts on all counts.

**¶59**        We review the denial of a motion to vacate a judgment for an abuse of discretion. *State v. Parker*, 231 Ariz. 391, 408, ¶ 78 (2013). It is well-settled that a jury verdict cannot be impeached by a juror who agreed to the verdict in open court. *State v. Kiper*, 181 Ariz. 62, 68-69 (App. 1994). A narrow exception to this general rule permits a court to consider a juror's testimony or affidavit, however, when the verdict is challenged based on certain juror misconduct. *See* Ariz. R. Crim. P. 24.1(d). As enumerated in Arizona Rule of Criminal Procedure 24.1(c)(3), the nature of qualifying juror misconduct under the exception is limited to: (1) receiving evidence not properly admitted during trial, (2) deciding the verdict by lot, (3) perjuring oneself or willfully failing to respond fully to a direct question posed during the *voir dire* examination, (4) receiving a bribe or pledging one's vote in any other way, (5) becoming intoxicated during the course of the deliberations, or (6) conversing before the verdict with any interested party about the outcome of the case.

**¶60**        Although Silva does not dispute that each of the jurors affirmed the accuracy of the verdicts in open court, he asserts the foreman engaged in misconduct that authorized the superior court to consider the juror's affidavit for impeachment purposes. Specifically, Silva contends the foreman failed to properly phrase the juror's question to the court. First, we note that the juror did not make such an avowal in her affidavit. She stated that she would have asked the superior court "what would happen if [she] could not reach a verdict on certain charges based on the evidence because [her] position was different from the other jurors," but did not claim that she had asked the foreman to ask that specific question and he had refused or otherwise rephrased it. More importantly, however, this

alleged "misconduct" is not among the enumerated exceptions to the general rule prohibiting the use of juror affidavits to impeach verdicts read and affirmed in open court. Therefore, the superior court did not abuse its discretion by denying Silva's motion to vacate the judgment.

## CONCLUSION

**¶61** For the foregoing reasons, we modify the judgment to reflect that Silva's conviction for theft is a class three felony and remand to the superior court for resentencing as to that count. We affirm Silva's other convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED: AA